COMMONWEALTH *vs.* ROBERT E. MARSHALL.

Suffolk.   March 7, 1977. — July 12, 1977.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Homicide. Practice, Criminal,* Bail, Capital case, Psychiatric examina-
tion, Isolation of jury. *Jury and Jurors. Insanity. Words,* "Capi-
tal case."

A judge did not abuse his discretion in denying bail to a defendant
charged with murder in the first degree. [66-67]

A defendant charged with murder in the first degree could not waive
trial by jury in accordance with G. L. c. 263, § 6, even though at the
time of his trial the death penalty could not have been imposed on
him. [67]

This court would not consider a defendant's claim that certain testi-
mony at his trial violated his privilege against self-incrimination
where the defendant neither objected to nor made a motion to strike
the testimony. [67-68]

At a criminal trial, a judge did not abuse his discretion in ordering the
jury sequestered, in drawing jurors from the jury pool after a spe-
cial venire had been exhausted, and in allowing the jurors to sep-
arate in order to vote in a municipal election. [68-70]

Evidence at a murder trial warranted a finding that the defendant was
sane at the time he committed the crime. [70-71]

At the murder trial of a defendant who raised a defense of insanity,
the judge did not err in his instructions to the jury regarding the
burden of proof of insanity. [71]

INDICTMENTS found and returned in the Superior Court
on February 12, 1975.

The cases were tried before *McLaughlin,* C.J.

*Michael R. Pizziferri* for the defendant.

*John T. Gaffney,* Assistant District Attorney, for the
Commonwealth.

WILKINS, J.   The defendant was found guilty of mur-
der in the first degree of Virginia MacDonald and Paul E.
Mahoney. He argues six assignments of error relating to
(1) the denial of bail, (2) the admission of testimony re-
garding his refusal to submit to certain court-ordered ex-

aminations, (3) the refusal to allow him to waive a trial by jury, (4) aspects of the selection and sequestration of the jury, (5) testimony by a Commonwealth witness regarding the insanity defense, and (6) the judge's answer to a question from the jury. There was no error, and there is no occasion under G. L. c. 278, § 33E, to order a new trial or to reduce the verdicts.

The facts of the killings were testified to by two eyewitnesses, one Nancy Russell and one Robert Selvitella. About 11 A.M. on December 22, 1974, Russell, Selvitella, and the two victims were finishing breakfast in the kitchen of Selvitella's apartment in Revere, when the defendant knocked at the door. He appeared to be angry and serious, and inquired of MacDonald, who had previously dated the defendant, where she had been all night because her mother was looking for her. The defendant then turned to Mahoney, his former business partner, and said, "You took my business and now you took my girl too." There was evidence of a conversation between the defendant and MacDonald and between the defendant and Mahoney. When he was offered a cup of coffee, the defendant stated that he did not feel he was among friends. As he began to leave, he turned, spoke to MacDonald, pulled out a gun, and shot her in the arm. He then shot Mahoney twice. MacDonald, who had fallen to the floor, pleaded with the defendant not to shoot. The defendant then shot her in the face and chest. As the defendant was attempting to reload the gun, Russell and Selvitella fled. Russell testified that after she left she heard two more shots. At 12:15 P.M., the defendant appeared at the Revere police station, placed a gun on the desk of the duty officer, and said, "I think I just killed a couple of people." He claimed to have no memory of anything that happened between the time he said, "You took my business and now you took my girl too," and a time when he became aware of driving his car.

1. The defendant argues that he was denied bail in violation of his rights under the Eighth Amendment to the Constitution of the United States. Because he was charged with murder in the first degree, the matter of bail was dis-

cretionary, as we held in *Commonwealth* v. *Carrion,* 370 Mass. 408, 410-411 (1976).[1] We see no basis to conclude that there was any abuse of discretion in denying bail to the defendant. Moreover, at this stage of the proceedings, even if bail was denied to him improperly, the defendant would have to establish that he was prejudiced by the denial. Although he asserts that his defense was inhibited, the record does not support the claim. We see no indication that the defendant's case was prejudiced because his psychiatrists had to travel to visit him.

2. The defendant asserts that G. L. c. 263, § 6, which forbids waiver of jury trial in "capital" cases, did not apply to his trial because at the time of his trial the death penalty could not have been imposed on him. See *Commonwealth* v. *O'Neal,* 367 Mass. 440 (1975) (*O'Neal I*).

This same contention was discussed and dismissed in *Commonwealth* v. *O'Brien,* 371 Mass. 605, 606-607 (1976), where we said that the definition of "capital case" in G. L. c. 278, § 33E, "governs the meaning of that phrase in c. 263, § 6." For the purposes of review by this court, G. L. c. 278, § 33E, as amended through St. 1974, c. 457, defines a "capital case" as one "in which the defendant was tried on an indictment for murder in the first degree and was convicted of murder either in the first or second degree." The defendant was indicted on two counts of murder in the first degree, and was found guilty of murder in the first degree on both indictments. The defendant could not waive trial by jury.

3. On motion by the Commonwealth, the judge ordered the defendant to submit to a brain wave scan and a computerized axial tomography (CAT) scan examination as part of the testing requested by the psychiatrist appointed to examine the defendant pursuant to G. L. c. 123, § 15. The defendant argues here that the order exceeded the scope of authority to order psychiatric testing in G. L.

---

[1] The defendant does not even cite the *Carrion* case in his brief, a circumstance which is more than surprising because his counsel was counsel for the defendant in that case.

c. 123, § 15, and that the testimony of a Commonwealth witness to the fact of the defendant's refusal to take the tests violated the defendant's privilege against self-incrimination.

In answering a question on cross-examination, the Commonwealth's expert testified that he was unable to conduct a physical examination of the defendant because he refused to be examined. This statement does not amount to a disclosure that the defendant declined to submit to court-ordered tests. In any event, not only was the testimony elicited as a result of questioning by the defendant, but the defendant did not object to the statement and made no motion to strike the testimony.[2] We will not consider on appeal issues which are not properly preserved at trial. *Commonwealth* v. *Ambers,* 370 Mass. 835, 838 (1976). *Commonwealth* v. *Core,* 370 Mass. 369, 377 (1976).

Because the defendant did not submit to the examination, we need not decide if the order exceeded the authority of the court under G. L. c. 123, § 15, or under any other authority. We add, however, that there is no constitutional ground for challenging a court order that a defendant submit to physiological tests, such as a brain wave or a CAT scan examination, accompanying a properly ordered psychiatric examination. *Blaisdell* v. *Commonwealth,* 372 Mass. 753, 765, 767-769 (1977).

4. The defendant argues that the trial judge abused his discretion in ordering the jury sequestered, in drawing jurors from the jury pool after a special venire had been exhausted, and in allowing the jurors to separate in order to vote in a municipal election.

The defendant concedes that the decision to lock up the jury during the trial rested in the sound discretion of the judge. *Commonwealth* v. *Abbott Eng'r, Inc.,* 351 Mass. 568, 572 (1967). He argues, however, that, because the Commonwealth gave reasons for its request to lock up the

---

[2] The *defendant's* assertion in his brief that he objected to the witness's statement is unsupported by a record reference and from our review of the transcript is a blatant misrepresentation.

jury, the Commonwealth should have been required to prove that those reasons were justified. We do not accept this limitation on the judge's discretion. In the exercise of discretion, a judge may choose to hear reasons on the issue from both sides. He is not obliged, however, to believe either party or to require either to prove its assertions. *Commonwealth* v. *Demboski,* 283 Mass. 315, 320 (1933).

A special venire was called for the case, and, when that venire was exhausted, the judge selected jurors from the regular jury pool to complete the panel. The defendant objected on the ground that persons in the regular jury pool had nearly finished their time of service and might be experienced in criminal trials and, therefore, prejudiced in favor of the Commonwealth. He requested that an additional special venire be drawn. In *Commonwealth* v. *Hosman,* 257 Mass. 379, 386 (1926), the venire was exhausted and jurors were summoned from another session to complete the panel. There is no showing that the defendant was prejudiced in any way by the selection of jurors from the regular jury pool. See *Commonwealth* v. *Dyer,* 243 Mass. 472, 492-494, cert. denied, 262 U.S. 751 (1922).

The defendant objected to the judge's ruling that allowed the jurors, in the custody and control of court officers, to vote in a municipal election. He contends that, once the judge exercised his discretion to sequester the jury, it was error to allow them to separate before the trial concluded. He also makes an unsupported assertion that, during the course of voting, the jurors came under the control of various precinct workers. Without proof of prejudice, the defendant's claim of abuse of discretion cannot succeed. The jury had not begun their deliberations (see *Commonwealth* v. *Della Porta,* 324 Mass. 193, 194-195 [1949], and cases cited), and were under the control of court officers at all times. "[T]here was no evidence that any of the jurors had discussed the case with any of the persons to whom the defendant's counsel referred or that any discussion of the case had taken place in their presence." *Commonwealth* v. *Charland,* 338 Mass. 742, 746 (1959). So long as they are scrupulously protected from outside influ-

ence and from exposure to prejudicial matter, we see no reason why jurors should be prevented from exercising one of the privileges of citizenship merely because they have undertaken the responsibility of another.

5. The primary defense was lack of criminal responsibility. Two expert witnesses testified for the defense. One expert testified that, in his opinion, at the time of the crimes the defendant was suffering from a mental disease which had reached psychotic proportions and that he was so mentally ill with depression and overwhelmed by seeing his former girl friend and former business partner together that he lacked the capacity to conform his conduct to the requirements of law, and was unable to know right from wrong. The other expert testified that, in his opinion, at the time of the crimes the defendant was mentally ill and in an acute fugue state, and that he lacked substantial capacity to appreciate the wrongfulness of his conduct, and to conform his actions to those required by law. The testimony of these two experts conformed to the two-part test outlined in *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967).

After the defendant raised the issue of insanity, the Commonwealth offered testimony by a rebuttal witness. See *Commonwealth* v. *Killelea*, 370 Mass. 638, 643 (1976). The Commonwealth's expert testified that, in his opinion, the defendant had not been suffering from a mental disease or defect, that he had not been in a fugue state, and that he had had substantial capacity to appreciate the nature of his conduct and had been able to conform his conduct to the requirements of law. In his opinion, the defendant was suffering from a personality disorder with emotional instability and "aggressive acting out."

The defendant's argument that the Commonwealth's witness never gave an opinion consistent with the standards of the *McHoul* case is not supported by the record. It is clear that the expert was questioned as to his opinion in accordance with the principles of *Commonwealth* v. *McHoul, supra*. Even if the Commonwealth had produced no rebuttal psychiatrist, the jury could have found that

the Commonwealth sustained its burden of proof that the defendant was sane. See *Commonwealth* v. *Walker*, 370 Mass. 548, 577 (1976); *Commonwealth* v. *Kostka*, 370 Mass. 516, 521, 538-539 (1976).

6. The defendant argues that the judge gave improper instructions to the jury in response to a question regarding the burden of proof of insanity.[3] If the law regarding insanity was misstated, the convictions should be reversed. See *Commonwealth* v. *Killelea*, 370 Mass. 638, 646 (1976). The judge made it very clear that the burden of proof of each element of the crime, including that the defendant was sane, at all times remained with the Commonwealth. We see no error in the original charge or in the response to the jury question.[4] This case was tried before our decisions in *Commonwealth* v. *Walker*, 370 Mass. 548, 577-582 (1976), and *Commonwealth* v. *Kostka*, 370 Mass. 516, 525-538 (1976). The judge anticipated the reasoning and results of these opinions. His remarks quoted in note 4 *supra* could not reasonably be construed, as the defendant argues, as a ruling that the Commonwealth had met its burden of proof. There was no error.

7. Finally, the defendant, in his supplemental brief filed pro se, urges us to exercise our power and duty under G. L. c. 278, § 33E, and direct entry of a lesser degree of guilt than that found by the jury because of the "great weight

---

[3] The jury began deliberation at 12:04 P.M., on November 7, 1975, and returned with the following question at 2:50 P.M.: "What is the definition of *beyond a reasonable doubt* regarding the Commonwealth proving this man was sane?"

[4] In the course of his answer to the jury's question, and in explanation of the effect of the probability that all men are sane, the judge made the following statements: "[I]f there is no evidence of insanity introduced by the defendant, well and good. But if the suggestion of insanity is raised by the defendant, then it is up to the Commonwealth and they better get up and meet it, which is what happened in this case. The Commonwealth rode along with the presumption until it rested its case and then up came two psychiatrists and raised the issue of insanity. And in accordance with good trial practice, and I think it will probably be good law, the Commonwealth then had to introduce affirmative evidence of sanity so you would have something to consider together with that probability of presumption, if I might call it that."

of evidence of insanity." We have reviewed the entire record and transcript and believe that verdicts of murder in the first degree were justified. The issue of insanity was fairly before the jury, and justice does not require that we disturb their verdicts.

*Judgments affirmed.*