Commonwealth *vs*. Max J. Allen & others. [1]

Suffolk.   September 12, 1979. — January 23, 1980.

Present: Hennessey, C.J., Quirico, Braucher, Kaplan, & Liacos, JJ.

*Jury and Jurors.   Practice, Criminal,* Examination of jurors, Investiga-
     tion of jurors, Mistrial, Sequestration of jury, Instructions to jury.
     *Evidence,* Cross-examination.

Where the defense attorneys at a criminal trial ceased all investigation of
     potential jurors after the judge expressed grave doubts as to the pro-
     priety of the investigators' questioning of the jurors' neighbors, even
     though the judge did not order that the investigation cease, the defend-
     ants' motion for a mistrial based on the judge's supposed interference
     with the investigation was properly denied.   [568-575]
Discussion of procedures for the preempanelment investigating of pro-
     spective jurors.   [575-580]
At a criminal trial, the judge did not abuse his discretion in permitting
     nine of the sequestered jurors to go unescorted to the polls to vote.
     [580-582]
At the trial of three defendants for conspiring to cause a building to be
     burned, the defendants were not prejudiced by a series of questions on
     cross-examination of the wife of one of the defendants as to whether
     she recalled receiving telephone calls on various dates reporting fires at
     properties owned by her husband, to which she repeatedly answered
     "No" or "I don't know," where the judge promptly instructed the jury
     not to consider the questions as evidence and repeated this caution dur-
     ing his charge to the jury.   [582-584]
There was no merit to the defendants' claim that the judge at a criminal
     trial failed to give adequate instructions to the jury as to whether they
     could consider an accomplice's plea-bargaining with the Common-
     wealth in weighing his credibility.   [584-585]

Indictments found and returned in the Superior Court
on October 13, 1977.

---

[1] Michael R. Cappiello and Martin Koplow.

The cases were tried before *Dwyer, J.*

The Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Richard A. Gargiulo* for Michael R. Cappiello.

*Ronald F. Kehoe (Barbara Bruce Williams* with him) for Max J. Allen.

*Albert L. Hutton, Jr.,* for Martin Koplow.

*Paul W. Shaw,* Assistant Attorney General, for the Commonwealth.

QUIRICO, J.  On October 13, 1977, two indictments were returned against Max J. Allen, Michael R. Cappiello, Martin Koplow and George Lincoln, each charging them with conspiring to commit a crime involving a building at 50 Symphony Road in Boston.  One indictment charged them with conspiring to cause the building to be burned, and the other with conspiring to cause the building to be burned with intent to defraud and injure the insurer thereof, both indictments alleging that the crimes were committed between February 1 and August 8, 1975.  Allen, Cappiello and Koplow (the defendants) were tried together to a jury and were convicted on both indictments on September 29, 1978.  They were then sentenced to serve concurrent terms in a house of correction and to pay fines as follows: Allen, two years and $10,000; Cappiello, two and one-half years and $10,000; and Koplow, eighteen months and $5,000.[2]

The cases are now before us on the appeals by the three defendants under G. L. c. 278, §§ 33A-33G, as the result of our removal of the cases from the Appeals Court on our own initiative.  G. L. c. 211A, § 10(A).  Lincoln was not tried with the defendants, but he was the principal prosecution witness against them.  He later pleaded guilty pursuant to a plea-bargaining arrangement.

---

[2] The judge denied a stay of execution of the sentences.  Further proceedings resulted in the release of the defendants on personal recognizance on March 21, 1979, pursuant to an order by a single justice of this court.  These further proceedings are described in detail in *Commonwealth* v. *Allen,* 7 Mass. App. Ct. 856 (1979), *S. C.,* 378 Mass. 489 (1979).

The defendants have joined in a single brief in which they argue errors allegedly committed by the trial judge in relation to the following matters: (a) a pretrial investigation of prospective jurors conducted by investigators hired for that purpose by defense counsel, (b) the separation of members of the sequestered jury for the purpose of voting in a primary election, (c) the scope and extent of the cross-examination of Rose Koplow, the wife of one of the defendants, and (d) instructions to the jury regarding the testimony of accomplices to the alleged crimes. We hold that there was no error and therefore affirm the convictions.

We summarize the evidence to the extent necessary for our disposition of these appeals.

In 1966 the defendants Allen and Cappiello purchased the three story, twenty-nine unit apartment building at 44-50 Symphony Road as an investment. In 1968 they conveyed the property to Koplow, as trustee of a realty trust, subject to the mortgage then outstanding. Koplow was to repair the building, rent and manage it, and pay the mortgage instalments when due. In 1972 Koplow refinanced the property which resulted in the discharge of the prior mortgages and the giving of a new one in the increased amount of $125,000. At the request of the mortgagee bank, Allen and Cappiello signed an agreement to guarantee payment of the mortgage, and they also indemnified Koplow against personal liability on the mortgage. In the several years thereafter the Symphony Road area deteriorated generally, with many apartment buildings vacant, boarded up or uninhabitable.

Koplow's building suffered damage from two fires, one on March 10, 1974, and another on February 26, 1975, at which times it was covered by fire insurance of $125,000. The insurer paid $25,132.83 as a result of the first fire and $36,904 as a result of the second fire. Certain proceeds from the fire insurance were applied to the reduction of the mortgage, leaving a principal balance of about $77,000. At this time the mortgage was in default, and nearly $7,000 was owed in back real estate taxes. The firemen found

some evidence that the second fire was of incendiary origin, and there was reason to believe that the fire insurer might cancel its policy.

Cappiello started seeking buyers for the property late in 1974, and in the course of that search he met Lincoln in the spring of 1975. Lincoln testified that Cappiello told him that Koplow had set the February, 1975, fire (to collect on the fire insurance policy) but that he had not done a sufficiently thorough job. He testified further that he and Cappiello negotiated an agreement under which the defendants would convey the property to Lincoln, who would procure insurance and then burn the building to pay off the balance of the mortgage, provided the defendants would first pay off all arrears on the mortgage, taxes, and water bills to avert suspicion. For this, again according to Lincoln, he was to receive $10,000 in cash and title to the property before the fire, and he was to have the benefit of any refunds of real estate taxes in the event of abatements, and of any excess of proceeds from the fire insurance remaining after paying off the mortgage.

The three defendants met with Lincoln and his attorney at Cappiello's law office on May 12, 1975, and, after some further negotiations, an agreement was signed providing for the sale of the Symphony Road property by Koplow to Lincoln for $108,000. Two days later the same parties again met at the same place for the passing of papers for the conveyance. Again there were further negotiations, but ultimately the transaction was closed and the property was conveyed to Lincoln. Thereafter, some disagreements arose between the parties with the result that on August 7, 1975, Lincoln, without notifying the defendants, recorded a deed transferring the property back to Koplow.

There was much additional evidence which, if believed, would tend to prove the existence of the conspiracies charged against the defendants in the two indictments in question, but it is not necessary to summarize this evidence for our decision of the limited issues argued by the defendants. How-

ever, we shall refer to additional evidence when we discuss those issues.

1. *Investigation of Venire Members by Defense Counsel.*

On August 1, 1978, the judge, in anticipation of the trial of this case, ordered summonses to issue for two special venires of 100 persons each, one for September 12 and one for September 13, 1978. Empanelment of the jury began on September 13, and entailed voir dire questions in addition to those specified by G. L. c. 234, § 28. These additional questions related to media coverage of arson charges, attitudes about arson and about insurance companies, and other matters.[3] Thirteen prospective jurors were questioned, and two were empanelled, the first day. Nine more were questioned, and one seated, on the morning of September 14. At the mid-morning recess, the Commonwealth informed the judge during a lobby conference that investigators for the defendants had been at work in the prospective jurors' neighborhoods, interviewing neighbors of the prospective jurors. As the ensuing and later exchanges between judge and counsel are important to our disposition of this appeal, we reproduce portions of them:

THE JUDGE: "Are the facts that he asserts substantially true?"

COUNSEL FOR CAPPIELLO: "Do we agree? Yes, your Honor."

THE JUDGE: "You have conducted interviews in the neighborhoods where the jurors were from?"

COUNSEL FOR CAPPIELLO: "Yes, your Honor."

THE JUDGE: "Don't you think that's extraordinarily dangerous?"

---

[3] Before trial, defendants Allen and Cappiello moved to dismiss the indictments because of extensive pretrial publicity relating to a so called "arson ring" of which the defendants were allegedly a part. The judge held a hearing on the motions and then denied them. In doing so he filed findings and rulings which noted the extent of the publicity and the fact that much of it had been intentionally generated by the office of the Attorney General. He further specified that he would conduct an extensive voir dire examination to ensure against prejudice to the defendants. The defendants in this appeal do not contest the denial of their motions to dismiss.

COUNSEL FOR CAPPIELLO: "Well, your Honor, I think that, understanding our responsibility and reviewing the statute and reading what authority granted us to exercise our discretion and — within the responsibility of the statute, we carefully made sure we never interviewed any jurors, jurors' families, relatives of any jurors, and I so represent."

THE JUDGE: "But wouldn't the juror know — couldn't the juror find out that you people were investigating her by the interviewee telling her or him?"

COUNSEL FOR CAPPIELLO: "Quite possibly."

THE JUDGE: "I think it's highly unethical. I've never heard it done before. Maybe there's precedent for it. Is there? Am I living in a fairyland? Has the law changed so much that you can go into the neighborhood of jurors and interview next-door neighbors?"

COUNSEL FOR CAPPIELLO: "I don't know if that's been done."

THE JUDGE: "You're interviewing neighbors, no?"

COUNSEL FOR CAPPIELLO: "Let me make sure — they are noting the type of neighborhood, the type of house they live in."

THE JUDGE: "That's no problem. You certainly are entitled to that. I'm talking about interviewing neighbors."

COUNSEL FOR CAPPIELLO: "I don't know that that was done, your Honor."

THE JUDGE: "That's the part that's bothering me."

At that point counsel for Koplow volunteered to have the investigator called into court to explain what was being done. The court responded:

THE JUDGE: "Okay. We'll do that at quarter of two. I'd like some enlightenment in this area. To me — I'm not quite a novice in this field. To me — that strikes me as an extraordinarily dangerous practice. If there ha[ve] been interviews of neighbors on either side of a potential juror's home and there's the likelihood and reasonable likelihood that that would get to them themselves — 'You're being investigated by the defendants' — that can have a very inhibiting effect on somebody and create fear, but until I know more about it, we are just going to let it lay right there."

Empanelment then resumed. After two more prospective jurors were questioned, defense counsel requested a bench conference. At the bench, counsel for Koplow began by stating that the investigation wasn't his idea, but that he acquiesced in it, based partly on his thinking that "certainly the Government does similar things in investigating the background of jurors . . . ." The judge responded in the following colloquy:

THE JUDGE: "Interviewing neighbors? Never heard of it."

COUNSEL FOR KOPLOW: "Not interviewing neighbors —"

THE JUDGE: "That's the part that bothers me."

COUNSEL FOR KOPLOW: "It bothers me a little bit now that your Honor mentions it."

The judge then called the attention of counsel to the ABA Standards Relating to the Prosecution Function and the Defense Function, § 7.2 (b), at 263 (Approved Draft 1971), the commentary of which he quoted to the effect that "[e]xcept in unusual circumstances [of] necessity, [counsel] should limit his inquiry to records already in existence, rather than make contemporaneous inquiry of the potential juror's neighbors." This exchange followed:

THE JUDGE (continuing): "It's right on point, and it refers to the Code of Ethical Conduct —"

COUNSEL FOR CAPPIELLO: "I think what we're asking for the lobby conference for is because we don't want to in any way — if we're wrong, we want to so advise the Court what has been done and, as [counsel for Koplow] has said —"

COUNSEL FOR KOPLOW: "If it's wrong, we want to stop it because it's going on right now."

COUNSEL FOR CAPPIELLO: "What we have done is —"

THE JUDGE: "I'm going to leave that to your judgment. I have no position in the matter until I know what all the facts are. We will go into that, gentlemen, at quarter of two. I want to tell you this: I take an extraordinarily serious view of it."

Counsel for Cappiello: "Let me advise the Court that this investigator, and the retired police officers that he has hired, ha[ve] been advised at 12:10, if he can be reached to cease until the Court hears more on this."

The judge: "Okay."

The judge then asked counsel for suggestions on how to ensure that jurors already seated had not been made aware of or affected by the investigation. All parties agreed that the seated jurors be asked if they were aware of any inquiry in their neighborhoods by the defendants. Specifically, counsel for the defendants said that they did not object to the judge's naming the defendants as the source of the inquiry, "where we were responsible for this having been done," and to "mitigat[e] any possible effect [from] it." They assured the judge that only part of the first special venire list and no more than a few on the second list had been investigated. The empanelment process again resumed.

The investigators were not present at the start of the afternoon session for the scheduled hearing, but a lobby conference was held at the defendants' request. Counsel referred to various precedents in support of their investigation, and pointed out that the ABA standard quoted by the judge was not in force in Massachusetts, but repeated that the neighbor interviews had been conducted without the express direction of counsel, who had been "primarily interested" in the qualities of the jurors' neighborhoods. The judge expressed willingness to hear counsel on "what the proper or improper thing was to do," but reiterated that his principal concern was to ensure that the seated jurors had not been intimidated. Defense counsel then questioned the judge's authority to require defense counsel to disclose to the court information provided by their investigators. The judge offered to give defense counsel time to appeal his decision to interview the investigators, but he stated that otherwise he would proceed, and added: "I don't accept your premises or precepts of ethical standards, written or unwritten, that you're giving in this lobby conference." Discus-

sion continued on ways to ascertain any impact of the investigation on presently seated jurors. Counsel for Koplow stated that he was troubled as to his duty to his client with respect to the investigation, and stated that the court's "indirect" ruling on the investigation had caused defense counsel "to cease as soon as we heard that your Honor felt that there might be something wrong with" the practice. He requested a ruling on the record concerning the investigation. The judge responded:

THE JUDGE: "I'm giving you no order now. I'm making no order for the record now. I'm making a judicial inquiry, under my authority to maintain the integrity of a jury that's about to hear a case. That's the very limitation I have right now, and until such time as my inquiry is completed, I will make no orders. When it is, I may not make any then. I may reserve them until the end of the trial. At any rate, my primary problem is to protect the integrity of this jury. It's as simple as that. This may all be mooted when we hear the facts that none of the jurors that we've selected — no one's gone into their neighborhood at all."

Defense counsel then informed the court that some of the seated jurors had in fact been investigated, and offered to provide some information. The judge responded:

THE JUDGE: "All I want is from somebody who instigated this inquiry to be in a position to tell us — tell the Court what persons' neighborhoods have been investigated. That's all. I just don't want to waste time on 150 veniremen if they have only gone to 50. So, now, that's our problem." The judge and counsel then agreed that the investigators would be heard the next morning, and counsel excepted to the judge's refusal to make a ruling.

Empanelment then continued, and by the end of the day eight jurors had been empaneled. The judge then inquired of the jurors en banc whether they were aware of any inquiry in their neighborhoods, and none responded affirmatively.

No further proceedings regarding the investigation were conducted the next morning, except that three more jurors

were seated, including two from the first special venire, and
the judge inquired of each of the three whether they were
aware of any neighborhood inquiry. All responded nega-
tively. The first venire had then been exhausted. Prior to
the afternoon session, the Commonwealth inquired wheth-
er any juror on the second list had been investigated, and
was assured that none had been. Counsel for Koplow then
stated that "the record should note that it was after your
Honor's strong questioning of the propriety of such an inves-
tigation being made that counsel ceased continuing that
conduct." This exchange followed:

THE JUDGE: "I know you're trying to preserve some appel-
late right in that regard, but I don't think the record will in-
dicate that I forbade a continuance of it, even though in the
lobby you tempted me to do so. I refused to order you to
stop that, so I want to make my position quite clear, too."

COUNSEL FOR ALLEN: "Well, perhaps — I think the rec-
ord is already clear, but I think it should be noted on the
record, if it's not, that the Court took the position with
counsel that engaging in the conduct in that regard that
counsel were so engaged in was unethical, in the Court's
opinion, and it was in response to the attitude and position
taken by the Court that counsel ceased the inquiry or inves-
tigation of prospective jurors to the extent that it was being
done prior to that."

THE JUDGE: "Whatever I've said, I've said, and the record
will show it. The record will clearly indicate there was no
order for you to desist from the practice, because I under-
stand that the position of all defense counsel is it's perfectly
proper to have done what they did do."

At the conclusion of the empanelment of the jury, counsel
moved for a mistrial based on the court's interference with
jury selection by inhibiting the jury investigation, which
motion was denied and exceptions were taken. Finally, at
the end of the trial, the judge inserted in the record copies of
the special venire lists, marked to show which jurors had
been the subjects of investigations or neighbor interviews,
"[s]ince the defendants have a potential appellate question

arising from the Court's action in connection with that in-
vestigation."

The defendants now claim that the various statements by
the judge during the empanelment amounted to a ruling by
him prohibiting the use of investigators in the jurors' neigh-
borhoods, or at least prohibiting the interviewing of neigh-
bors.   In support of this contention they cite *Sussman* v.
*Commonwealth,* 374 Mass. 692, 698 (1978), a case dealing
with the procedure by which an attorney must be warned
before the imposition of a *summary* contempt citation, in
the context of cross-examination of a witness.   There is no
claim or indication that defense counsel here were ever
threatened with summary contempt — at best there is a pos-
sible inference that the judge may have considered the possi-
bility of a plenary hearing on the question of contempt at
the end of the trial.

We hold that the judge's actions did not amount to a pro-
hibition of the defendants' jury investigation.   While the
judge made clear his disapproval of the defendants' activi-
ties, he repeatedly stated that he was leaving their course of
action up to the good judgment of counsel.   Counsel were
thus left responsible for making the difficult decision wheth-
er to pursue a questioned course of action without the full
benefit of his guidance.   The judge did not, however, either
expressly or impliedly order the investigation terminated.
The decision to terminate the investigation was made by de-
fense counsel.   Defense counsel admitted that they had not
instructed their investigators whether or not to conduct
neighbor interviews.   It is apparent that counsel desired in-
formation about prospective jurors' neighborhoods which
could be, and which they expected would be, gleaned with-
out such interviews.   The judge could reasonably have in-
ferred that defense counsel had not instructed the investi-
gators in proper procedures for such interviews.   When the
issue was raised unexpectedly, counsel were manifestly un-
certain of their factual, legal, and ethical grounds.   The
judge was under a "heavy responsibility," *Commonwealth*
v. *Dickerson,* 372 Mass. 783, 794 (1977), to preserve the im-

partiality of the jury, which was already of concern due to pretrial publicity, and he responded in a manner calculated to ascertain whether this impartiality had been compromised. Defense counsel shared this concern and, accordingly, offered to discontinue *all* investigation of veniremen, although only neighbor interviews were the subject of strong questioning by the judge. On reflection, counsel returned later and sought a ruling requiring their discontinuance of the investigation, and were denied one.

Absent a ruling to the contrary from the judge, counsel were free to reconsider their positions, to weigh the advantages and disadvantages involved, and then decide whether to continue with the investigation, which they believed ethically proper and helpful to their clients. They are not entitled to second guess their strategic choices on appeal. The defendants were not deprived of any right to investigate veniremen by the judge. His failure, or refusal, so to rule when they requested him to do so was not legal error, on the limited information before him at that time. The motion for mistrial based on the judge's supposed interference with the investigation was properly denied. We need not reach the defendants' claims that the purported ruling deprived them of the right to an impartial jury or to the effective assistance of counsel.

Because the preempanelment investigating of prospective jurors, which includes the interviewing of neighbors, has not previously been directly addressed by this court, we proceed to do so by way of dictum for guidance of the Bar.

The practice of permitting counsel to acquire information about prospective jurors in advance of trial, to prepare for the exercise of their challenges, is long established.[4] The

---

[4] See, e.g., 4 W. Blackstone, Commentaries 351-352 (1778), citing statutes entitling defendants in certain capital cases to the list of jury panel members before trial. Today such provisions are found in G. L. c. 277, § 66, and 18 U.S.C. § 3432 (1976). Blackstone elsewhere, in extolling the virtues of the English civil jury system, points to the practice whereby the prospective jury panel "is returned to the court upon the original [writ of] venire, and the jurors are to be summoned and brought in many weeks af-

statute governing challenges for cause, G. L. c. 234, § 28, allows a party to introduce, in addition to the information elicited on voir dire, "other competent evidence" in support of a challenge for cause. *Commonwealth* v. *DiStasio*, 294 Mass. 273, 280 (1936). In *Commonwealth* v. *Wong Chung*, 186 Mass. 231, 237 (1904), this court noted that parties have a responsibility to protect their rights respecting challenges for cause, and that methods of investigation other than voir dire are available for this purpose. In *Dolan* v. *Commonwealth*, 304 Mass. 325, 343 (1939), we approved the statement that "lawful investigation [of prospective jurors] is proper." In a series of decisions we concluded that there was no prejudice to defendants arising from police investigation, in some cases including interviewing, of veniremen before trial.[5] We note, however, that direct contact with prospective jurors and members of their families has since been prohibited to parties by statute and by rule of this court. See G. L. c. 234, §§ 24, 24A; S.J.C. Rules 3:22, DR 7-108 (A), (F), 359 Mass. 796, 826-827 (1972), and 3:22A, PF 10, DF 11, 377 Mass. 926, 931 (1979).

The right to exercise peremptory challenges, provided by G. L. c. 234, § 29, has been called "one of the most important of the rights secured to the accused," *Swain* v. *Alabama*, 380 U.S. 202, 219 (1965), quoting *Pointer* v. *United States*, 151 U.S. 396, 408 (1894). In *Commonwealth* v. *Soares*, 377 Mass. 461 (1979), we reexamined this right and prohibited its misuse to eliminate jurors solely because of their membership in discrete groups, but we preserved "a

---

terwards to the trial, whereby the parties may have notice of the jurors, and of their sufficiency or insufficiency, characters, connections, and relations, that so they may be challenged upon just cause." 3 W. Blackstone, Commentaries 355 (1778). See also *id.* at 353 (procedure for trial at nisi prius altered to give parties notice of prospective jurors).

[5] *Commonwealth* v. *Smith*, 350 Mass. 600 (1966). *Commonwealth* v. *McCann*, 325 Mass. 510 (1950). *Commonwealth* v. *Sherman*, 294 Mass. 379 (1936). *Commonwealth* v. *DiStasio*, 294 Mass. 273 (1936). *Commonwealth* v. *Millen*, 289 Mass. 441 (1935). *Commonwealth* v. *Cero*, 264 Mass. 264 (1928). See *Commonwealth* v. *Dougherty*, 343 Mass. 299 (1961) (use of probation office questionnaire to prospective jurors).

legitimate and significant role for the peremptory challenge" as a tool to "eliminate prospective jurors whose unique relationship to the particular case raises the spectre of individual bias." *Id.* at 485.

Concomitant to the use of both peremptory challenges and challenges for cause must be the implied right to use reasonable means to gather information which will aid the parties in the intelligent exercise of challenges toward the constitutionally mandated goal of a fair and impartial jury. This right has always been subject to reasonable limitation, by the nature of the jury system, the requirements of the speedy and efficient administration of justice, and the reasonable discretion of the trial judge to protect against abuses. It is further limited by statutes regulating the jury system, and ultimately by the jurors' right to privacy. Still, the opportunity for such pretrial investigation of veniremen has never been foreclosed, and is an inherent part of the jury system as it has developed.[6]

The most efficient and least expensive method for providing counsel with information relevant to the exercise of jury challenges would seem to be a questionnaire administered by a public official which would be completed and returned prior to or at the start of jury service.[7] Such a questionnaire, use of which may require the amendment of existing statutes,[8] could provide counsel with considerable

---

[6] See note 10, *infra.*

[7] General Laws c. 234A, § 18, allows for such a questionnaire in Middlesex County, administered by the jury commissioner. In other counties the commissioner of probation prepares a "juror information form" to be completed by veniremen for use in determining qualifications for jury service. See G. L. c. 234, § 24B.

[8] General Laws c. 234, § 24, as amended through St. 1956, c. 278, provides that after a juror has received a summons for duty "no person shall, except as otherwise provided by law, question any person so summoned for the purpose of obtaining information as to his background in connection with his jury duty." General Laws c. 234, § 24A, contains a virtually identical provision. See *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 215-219 (1971), cert. denied sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910, and sub nom. *Beneficial Fin. Co.* v. *Massachusetts*, 407 U.S. 914 (1972).

information useful to the exercise of challenges, and might make further investigation unnecessary.[9] Such a procedure would be of particular value to poorer litigants for whom the hiring of investigators is impossible. See Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan. L. Rev. 545, 558-563 (1975).

In instances where such information is not provided, or if the information provided is inadequate, however, parties are free to use investigators in a reasonable manner.[10] Subject to the constraints previously noted, we are aware of no rule prohibiting the interviewing of persons other than prospective jurors and members of their families as part of such an investigation. See *Dow* v. *Carnegie-Ill. Steel Corp.*, 224 F.2d 414, 430-431 (3d Cir. 1955). However, it is essential

---

[9] In counties other than Middlesex, parties are usually provided with only the name, address, occupation and place of employment or former employment of the juror, and the occupation and place of employment of the juror's spouse. See G. L. c. 234, §§ 4, 5. In Middlesex, pursuant to c. 234A, § 18, inserted by St. 1977, c. 415, § 2, the information provided to parties is much more extensive: "The information elicited by the questionnaire shall be such information as is ordinarily raised in voir dire examinations of jurors, including the juror's name, sex, age, residence, marital status, number and ages of children, education level, occupation, employment address, spouse's occupation, spouse's employment address, previous service as a juror, present or past involvement as a party to civil or criminal litigation, spouse's present or past involvement as a party to civil or criminal litigation, relation to a police or law enforcement officer, spouse's relation to a police or law enforcement officer, and such other information as the jury commissioner deems appropriate."

[10] Regarding such investigation see generally 1 F.X. Busch, Law and Tactics in Jury Trials § 145 (1959); A.F. Ginger, Jury Selection in Criminal Trials 331-364 (June, 1977 Biennial Supp.); Babcock, Voir Dire: Preserving "Its Wonderful Power," 27 Stan. L. Rev. 545 (1975); Heyl, Selection of the Jury, 40 Ill. B.J. 328 (1952); Okun, Investigation of Jurors by Counsel: Its Impact on the Decisional Process, 56 Geo. L.J. 839 (1968); Note, Challenging Jurors, 58 Dick. L. Rev. 384 (1954); Peremptory Challenge — Divining Rod for a Sympathetic Jury? 21 Cath. Law. 56 (1975); The Constitutional Need for Discovery of Pre-Voir Dire Juror Studies, 49 S. Cal. L. Rev. 597 (1976); Computers and Scientific Jury Selection: A Calculated Risk, 55 U. Det. J. Urb. L. 345 (1978); ABA Standards Relating to the Prosecution Function and the Defense Function §§ 5.3(b), 7.2(b) (Approved Draft 1971); ABA Standards Relating to Trial by Jury § 2.2 (Approved Draft 1968).

that in interviewing third parties investigators do not, by design or effect, influence, solicit, intimidate or propagandize either the persons interviewed or, indirectly, the prospective juror. The risk of this improper influence occurring may be minimized by certain precautions. First, the investigators should be persons who are not closely related or associated with a litigant or his family. Second, the investigators should, where possible, avail themselves of sources of information other than third-party interviews, if such sources are likely to provide the desired data.[11] Third, ideally investigators would be employed on a mutual or cooperative basis between parties, with the resulting information available to both sides.[12] If the investigation is not being made on behalf of all parties to a particular case, the investigators should not disclose the identity of the particular party or parties for whom it is being conducted. In any event, counsel are expected to retain effective control over the activities of their investigators.

Such investigations should be conducted subject to any rules or orders of the trial court applicable thereto. The trial judge may require that the parties submit the names of the persons who will be investigators, the types of information to be sought, procedures to be followed, and questions to be asked. If abuses appear in the course of an investiga-

---

[11] This suggestion is less restrictive than the language of the ABA Standards Relating to the Prosecution and the Defense Function referred to by the judge in his colloquy with defense counsel. See § 5.3(b) of the Prosecution Function and § 7.2(b) of the Defense Function. Effective March 1, 1979, this court adopted S.J.C. Rule 3:22A, 377 Mass. 922 (1979), incorporating some, but not all, of the material included in the ABA Standards Relating to the Prosecution and the Defense Functions, and with changes in the language from that of the ABA in some respects. However, rule 3:22A does not include any of the provisions concerning selection of jurors which are contained in ABA Prosecution Function § 5.3(b) or ABA Defense Function § 7.2(b).

[12] We are not called on to decide whether, absent this arrangement, the information generated should be discoverable under Mass. R. Crim. P. 14, 378 Mass. 874 (effective July 1, 1979). Cf. *Commonwealth* v. *Smith*, 350 Mass. 600, 603-604 (1966); The Constitutional Need for Discovery of Pre-Voir Dire Juror Studies, 49 S. Cal. L. Rev. 597 (1976).

tion, the judge should take any steps reasonably necessary to control them.[13]

Investigation of prospective jurors is, of course, subject to the limitations of the judicial process. For example, the fact that further time for investigation is desired should not be allowed to become a tool for delaying a trial. Where an unexpected depletion of the available venire occurs, requiring a special venire or the summoning of talesmen,[14] the opportunity for investigation may of necessity be extremely limited. Subject to such reasonable constraints, jury investigation, where desired, continues to be a permissible procedure in the preparation of cases for trial.[15]

2. *Release of Sequestered Jurors to Vote.*

The defendants claim that the judge erred in allowing nine of the jurors to separate and go unsupervised for four hours to vote in a primary election at the end of the first day of evidence in the case. The primary election was held on Tuesday, September 19, 1978. Prior to allowing the jurors

---

[13] Sanctions may include the remedies provided in G. L. c. 234, §§ 32, 33; c. 268, §§ 13, 13B; c. 278, § 29, as well as contempt or ethical sanctions. See *Dolan* v. *Commonwealth*, 304 Mass. 325 (1939).

[14] General Laws c. 234, §§ 12, 27, 42. See generally 3 W. Blackstone, Commentaries 364-365 (1778); 4 W. Blackstone, Commentaries 354-355 (1778); *Commonwealth* v. *Knapp*, 10 Pick. 477 (1830).

[15] We believe that the procedures outlined above meet concerns expressed in various quarters regarding investigations of prospective jurors. Cf., e.g., *Sinclair* v. *United States*, 279 U.S. 749, 765 (1929) (concern over character of investigators); *Kiernan* v. *Van Schaik*, 347 F.2d 775, 780 (3d Cir. 1965) (unsupervised investigation). We note that at least one jurisdiction under unusual circumstances has drastically limited the information about jurors available to defense counsel. *United States* v. *Barnes*, 604 F.2d 121 (2d Cir. 1979), petition for cert. filed, 48 U.S.L.W. 3179 (Aug. 17, 1979) (No. 79-261). We are not called upon to comment on such a course for this Commonwealth. Nor is it necessary here to discuss, although we note, the concern that overzealous investigation may represent a threat to jurors' privacy. Cf. *Salt Lake City* v. *Piepenburg*, 571 P.2d 1299, 1309-1313 (Maughan, J., dissenting) (Utah 1977); Okun, Investigation of Jurors by Counsel: Its Impact on the Decisional Process, 56 Geo. L.J. 839 (1968); Computers and Scientific Jury Selection: A Calculated Risk, 55 U. Det. J. Urb. L. 345 (1978). We rely, as did the judge, on the good judgment of counsel as the primary barrier against abuses.

to go unescorted to the various voting places involved, the judge unsuccessfully attempted to secure, first, absentee ballots, and then sufficient court officers to escort each juror to the polls. The judge, before releasing the jurors, instructed them not to discuss the case or to read or listen to any publicity related thereto. The nine jurors were allowed to leave at 4 P.M. and to return to sequestration by 8 P.M. The next morning the judge polled the jury as a group as to whether any information had come to them while they were away from the other jurors which would affect their impartiality "to the slightest degree," and stated that he would speak privately with any juror who had received any such information. No juror responded affirmatively to the judge's inquiry.

The defendants claim that the judge abused his discretion in allowing the jurors to go to the polls unescorted, and that his instructions to the jurors were insufficient to insulate them from exposure to information prejudicial to the defendants. They point particularly to the facts found by the judge in his decision denying the defendants' motions to dismiss the indictments because of publicity relating to an alleged "arson ring" and they point also to the fact that certain law enforcement officials who were seeking renomination at that primary election had made reference to the "arson ring" in their campaign advertising.

The judge had broad discretion to determine initially whether the jurors at this trial should be sequestered, and the same discretion to determine whether some or all of them should be allowed to separate for the limited time and purpose of exercising their rights to vote. When faced with a similar situation in *Commonwealth* v. *Marshall,* 373 Mass. 65, 69-70 (1977), we said: "So long as they [the jurors who were permitted to separate to vote] are scrupulously protected from outside influence and from exposure to prejudicial matter, we see no reason why jurors should be prevented from exercising one of the privileges of citizenship merely because they have undertaken the responsibility of another." What we said in that case applies equally to this

one. The judge took all reasonable measures to insulate the jurors against exposure to outside influence and there is no evidence that they were exposed thereto. The burden of proving any such exposure rests on the defendants and there is nothing in the record to show that the burden was met. *Marshall, supra* at 69. See *Commonwealth* v. *Fidler*, 377 Mass. 192, 201 (1979). *Commonwealth* v. *Nolin*, 373 Mass. 45, 49 (1977). The procedure followed by the judge in questioning the jurors collectively when they first again assembled after they had voted was in accord with that approved by this court in *Commonwealth* v. *Jackson*, 376 Mass. 790, 800-801 (1978).

We hold that there was no abuse of discretion or other error in the judge's action in permitting nine of the jurors to go to the polls to vote, or in the steps taken by the judge in satisfying himself after their return that they had not been exposed to improper influences.

3. *Cross-examination of Rose Koplow.*

Rose Koplow, the wife of the defendant Koplow, testified on her husband's behalf. She stated that he was at home in Randolph (about a thirty-minute drive from Boston) on the night of February 26, 1975 (when, it had been alleged, he had set a fire at 44-50 Symphony Road), and that she was present when he received a phone call that night telling him that the building was on fire.

On cross-examination the prosecutor asked Mrs. Koplow if she recalled where she was on another evening in 1975, and when she answered negatively, he asked if there hadn't been a fire at a different property owned by Koplow on that evening. After objection, the prosecutor stated at the bench that he was testing the witness's memory about other calls she received reporting fires at other properties owned by Koplow. He stated that he had evidence that the fire had occurred, but no evidence that any call was made to the Koplow home concerning it. The judge, over objection, allowed the prosecutor to ask the "sanitized" question: "Did you on or about [a certain date] at your home get a telephone call relative to a fire? Yes or no?" The prosecu-

tor proceeded to ask such questions about four different dates, each resulting in answers of "No" or "I don't know." Questions concerning a fifth fire were excluded as it was too remote from the time of the February, 1975, fire. After the first "sanitized" question and answer the judge instructed the jury that a question answered with "No" or "I don't know" or "I don't remember" constituted no evidence of any facts contained in the question. The next day during his charge, the judge repeated that the facts contained in those particular questions were not evidence.

The defendants argué that it was error for the judge to allow this line of questioning,[16] and that it was also error for him to deny their motions for mistrials based thereon. They further argue that it was error for the judge to allow the prosecutor to read the dates in question from a sheet of paper held in his hand during cross-examination, supposedly as a "prop."

The prosecutor apparently had evidence from the fire department that fires had occurred at Koplow properties on the dates he mentioned. Therefore his use of a list of such dates was not in itself objectionable. Compare 6 J. Wigmore, Evidence § 1808, at 374-375 (Chadbourn rev. 1976). However, his questions implied two factual predicates, one, that fires had occurred on certain dates and the other, that calls had been placed to the Koplow home. He admittedly had no evidence to support the latter assertion. Cf. ABA Standards Relating to the Prosecution Function § 5.7(d) (Approved Draft 1971). It is questionable whether the prosecutor was using this series of questions merely as a device to test Mrs. Koplow's memory of telephone calls received at home in the evenings.

We believe that the prejudice, if any, to the defendant must be held to have been cured by the judge's instructions. *Commonwealth* v. *Stewart,* 375 Mass. 380, 387 (1978). It is normally assumed that such instructions are followed by

---

[16] At the defendants' request, the cross-examination of Mrs. Koplow was admitted only in the case of Commonwealth *vs.* Martin Koplow.

jurors, absent any reason appearing in the record to suggest otherwise. *Commonwealth* v. *Brown,* 376 Mass. 156, 165 (1978). *Commonwealth* v. *Jones,* 373 Mass. 423, 426 (1977), and cases cited. The judge promptly instructed the jury not to consider the questions as evidence, and repeated this caution with specific reference to the questions at issue during his charge to the jury. *Id.* We hold that there was no error in his denial of the motion for mistrial. See *Brown, supra; Jones, supra.* It is unnecessary to discuss further the defendants' contention that the judge failed to explain adequately that Mrs. Koplow's testimony did not apply to the cases of all three defendants.

4. *Jury instructions.*

The defendants claim that the judge failed to give adequate instructions to the jury as to whether they could consider the fact of Lincoln's plea-bargaining with the Commonwealth in weighing his credibility. They assert that Lincoln's status as an accomplice, his plea bargaining, his admitted perjury in past cases, the fact that the defendants had threatened to sue him, and the importance of his testimony to the Commonwealth's case combine to require that more be given than a general instruction that the jury should consider the personal interest of any witness in the outcome of the case, in order to "focus the jury on the special factors attending the crucial issue of Lincoln's credibility." The defendants further assert that the judge confused the jury as to whether they could consider the fact of plea-bargaining in assessing Lincoln's credibility by his admittedly accurate instruction, given in delineating what was evidence in the case, that "[e]vidence is not whether or not you agree that the Commonwealth was wise or prudent to plea-bargain with Lincoln for his testimony."

We find no merit in these contentions. There was no requirement for an instruction that accomplice testimony should receive any special scrutiny. *Commonwealth* v. *Watkins,* 377 Mass. 385, 388-390 (1979), and cases cited. The defendants were given wide latitude in cross-examining Lincoln extensively concerning his plea-bargaining, his bias

and prejudice, his past perjury and other admitted criminal acts, see *Commonwealth* v. *Graziano,* 368 Mass. 325, 329-330 (1975), and in their final arguments they placed great emphasis on these matters as bearing on Lincoln's credibility. "Ordinarily the jury can be expected to take full account of such matters without more" than a general instruction that they weigh the credibility of each witness and consider any interest the witness has in the outcome of the case. *United States* v. *DeVincent,* 546 F.2d 452, 456 (1st Cir. 1976), cert. denied, 431 U.S. 903 (1977).

Early in his charge the judge drew the jury's attention to "the critical and crucial question" in the case, that being, "Did these defendants conspire together with Lincoln and agree with Lincoln to set fire to 50 Symphony Road?" He gave careful and lengthy instructions about the jurors' duty to determine the credibility of each of the witnesses, and to seek the truth by resolving the wide divergencies in the testimony. He instructed them to consider, in evaluating the credibility of each witness, the impact of any personal interest a witness may have in the outcome of the case. Without repeating his instructions, we hold that the judge fairly and accurately charged the jury. See *Commonwealth* v. *Little,* 376 Mass. 233, 239 (1978). We do not think the judge's statement that the wisdom or prudence of the Commonwealth's plea-bargaining agreement with Lincoln did not constitute evidence, confused the jury or foreclosed their consideration of that agreement as it may have affected Lincoln's credibility. If anything it reemphasized the negative aspects of Lincoln's character which had been revealed during his direct and cross-examinations, and to which defense counsel had devoted much time and emphasis during their final arguments. There was no error.

*Judgments affirmed.*