## COMMONWEALTH vs. ROBERT H. O'BRIEN.

Middlesex. January 2, 1979. — April 6, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & LIACOS, JJ.

*Homicide. Evidence,* Conversation between husband and wife, Privileged communication, Admissions and confessions, Presumptions and burden of proof, Insanity. *Insanity. Practice, Criminal,* Mistrial, Argument by prosecutor, Capital case. *Error,* Harmless error.

At a trial of a defendant charged with the murder of his wife, there was no error in admitting testimony by a witness with respect to a conversation between the defendant and his wife immediately prior to the murder where the discussion was not private but in the presence of the witness, and where the discussion, which involved abuse and threats, was not a private conversation of the type protected by G. L. c. 233, § 20. [774-775]

At the trial of a defendant charged with the murder of his wife at the office of his attorney, evidence that several minutes after the shooting the defendant requested the attorney to represent him was not inadmissible as a privileged communication between client and attorney. [775-776]

At a murder trial, the defendant's voluntary statement to a police officer was properly admitted where, although the defendant was in custody, there was no custodial interrogation requiring Miranda warnings. [776]

At the trial of an attorney charged with the murder of his wife, the prosecutor's leading questions with respect to the defendant's experience in criminal law, although improperly aggressive, did not require a mistrial. [776-777]

At a murder trial, the prosecutor's reference in his closing argument to one of the defendant's psychiatric witnesses as a "hired gun," although inappropriate, did not require a mistrial. [777-778]

At a murder trial, the prosecutor's speculation in his closing argument as to what conversation may have taken place between prior defense counsel and one of the defendant's psychiatric witnesses, while plainly improper, did not require reversal of the conviction when considered in the entire context of the prosecutor's argument. [778-779]

At a murder trial, the defendant was not entitled to a directed verdict of not guilty by reason of insanity where there was evidence from which the jury could have concluded beyond a reasonable doubt that the defendant was criminally responsible for his conduct. [779-780]

At a murder trial, there was no error in the judge's instruction that the jury could consider the fact that a great majority of men are sane and the probability that any particular man is sane. [780]

At a murder trial, the judge did not err in declining to order the Commonwealth to call as its own witness a court-appointed psychiatrist who had examined the defendant pursuant to court order. [780]

This court declined to exercise its power under G. L. c. 278, § 33E, to order a new trial for a defendant convicted of murder in the first degree where there was evidence tending to show that the defendant was criminally responsible and the opinions of the defendant's psychiatric witnesses as to the defendant's mental incompetence were not compelling. [780-784]

INDICTMENT found and returned in the Superior Court on December 5, 1974.

The case was tried before *O'Connor, J.*

*Alfred P. Farese (Neil P. Philbin* with him) for the defendant.

*Michael J. McHugh,* Legal Assistant to the District Attorney, for the Commonwealth.

WILKINS, J. On November 13, 1974, the defendant, a member of the bar of the Commonwealth, fatally shot his wife at the office of his attorney, Mr. Ralph Champa, in Somerville. The shooting brought to an abrupt conclusion a heated discussion concerning a separation agreement and a divorce. At trial, the defendant did not deny that he shot his wife, but he asserted that he was not criminally responsible for his act. The twenty-day trial concluded with a jury verdict that the defendant was guilty of murder in the first degree.

The defendant raises a variety of issues on appeal. We shall consider first the defendant's contentions concerning various evidentiary rulings. Next, we shall discuss the defendant's claims of prosecutorial misconduct in the Commonwealth's closing argument. Finally, we shall

deal with several issues relating to the treatment of a claim of lack of criminal responsibility in this Commonwealth, and particularly with the defendant's assertion that he was entitled to entry of a verdict of not guilty by reason of insanity or, at least, to relief under G. L. c. 278, § 33E. The defendant bases these latter contentions on the ground that the Commonwealth produced no expert testimony to rebut three expert defense witnesses who testified that the defendant was not criminally responsible for shooting his wife. We conclude that there was no reversible error in the course of the trial and that the defendant is not entitled to relief under G. L. c. 278, § 33E.[1]

### *Evidentiary Issues*

There is no validity to the defendant's argument that the testimony of Mr. Champa, recounting the conversation between the defendant and his wife immediately prior to the shooting, should have been excluded as a private conversation between husband and wife. See G. L. c. 233, § 20. The discussion in the presence of a third party was not private. See *Commonwealth* v. *Stokes*, 374 Mass. 583 (1978). Mr. Champa was a third party, and the fact that he was (or had been) the defendant's attorney does not change the situation. Moreover, the discussion, involving abuse and threats, was not a private conversation of the type with which the statute is concerned. See *Com-*

---

[1] The defendant has advanced several contentions that require little or no comment. Some arguments are wholly without merit. For example, there was no evidence warranting a charge to the jury on manslaughter. In other instances, the defendant has not preserved any appellate rights, either because of the absence of an objection and exception or because of a failure to assign the point as an error on appeal. Other objections relate to evidentiary matters within the discretion of the judge or to situations where any error was cured by the judge's instructions to the jury or rendered nonprejudicial by the introduction of other evidence. We see no need to discuss each of these arguments in the course of this opinion. We have considered them, however, in performing our duty under G. L. c. 278, § 33E.

*monwealth* v. *Gillis*, 358 Mass. 215, 218 (1970). Finally, the statute bars a husband and a wife from testifying as to private conversations. It does not forbid testimony by a third party concerning a conversation between a husband and a wife. See *Martin* v. *Martin*, 267 Mass. 157, 159 (1929).

The defendant objected to the introduction of testimony by Mr. Champa that, several minutes after the shooting, the defendant asked him, "Will you be my lawyer?" That evidence was relevant to the defendant's state of mind. The defendant argues, however, that it was inadmissible as a privileged communication between client and attorney. The attorney-client privilege may extend to preliminary communications looking toward representation even if representation is never undertaken. 8 J. Wigmore, Evidence §§ 2292, 2304 (McNaughton rev. 1961). On the other hand, the privilege runs contrary to the interest in full disclosure of relevant information and, therefore, should be narrowly construed. See *Foster* v. *Hall*, 12 Pick. 89, 97-98 (1831); *Fisher* v. *United States*, 425 U.S. 391, 403 (1976); *Prichard* v. *United States*, 181 F.2d 326, 328 (6th Cir.), aff'd per curiam, 339 U.S. 974 (1950); *United States* v. *United Shoe Mach. Corp*, 89 F. Supp. 357, 358 (D. Mass. 1950); Wigmore, *supra*, § 2291, at 554. See generally McCormick, Evidence, § 87, at 176 (2d ed. 1972). There is no presumption of confidentiality; it must be determined in the circumstances. Wigmore, *supra*, § 2311, at 600.

There are, no doubt, situations in which a person's belief that he needs legal representation could constitute a confidential communication protected by the attorney-client privilege. If the seeking of legal representation might be construed as evidence of consciousness of guilt, the mere fact of requesting legal representation might be protected. In this case, however, the fact that the defendant needed legal representation was obvious from the circumstances and hardly a confidential matter. The defendant was going to need immediate representation; his

arrest was imminent. In the circumstances, we do not view the defendant's request of Mr. Champa to have been intended to be confidential. Communications between attorney and client that are expected to be disclosed to others are not privileged. See *Commonwealth* v. *Michel*, 367 Mass. 454, 460 (1975); *Peters* v. *Wallach*, 366 Mass. 622, 627-628 (1975).

The defendant's voluntary statement to a police officer made shortly after the shooting was properly admitted. As the officer approached him, the defendant said, "No problem, no problem. I'm sorry. I know I'm under arrest." The defendant was in custody, but there was no custodial interrogation requiring Miranda warnings. As an unsolicited comment, the statement was admissible. See *Commonwealth* v. *Goulet*, 374 Mass. 404, 417 (1978); *Commonwealth* v. *Glavin*, 354 Mass. 69, 72-73 (1968).

On two occasions, the prosecutor asked improper, leading questions concerning the defendant's experience in the criminal law. On the fifth day of trial, he asked one of the psychiatrists called by the defendant whether he had taken into account "that the defendant was highly familiar with criminal law." The judge sustained an objection and promptly gave an instruction that there was no evidence, "at least to this point in the trial," that the defendant was a criminal lawyer or that he was experienced in criminal law. A mistrial was not required. The judge's instruction was appropriate and adequate. See *Commonwealth* v. *Eagan*, 357 Mass. 585, 589 (1970). On the twelfth day of trial, on redirect examination, the prosecutor asked Mr. Champa if the defendant had told him that he had worked for his then defense counsel. The question immediately followed the sustaining of an objection to another question on what the defendant had told Mr. Champa about where the defendant had worked. The defendant objected to the second question and moved for a mistrial, which was denied. The judge rightly criticized the prosecutor at the side bar but, without objection from the defendant, he concluded that, to avoid emphasizing the subject, no instruction should be given.

The prosecutor was entitled to establish, if he could, that the defendant had experience in the criminal law and that he had contrived his insanity defense. The major area of contention at the trial was whether the defendant was criminally responsible.

As the trial developed, evidence of the defendant's competence in the criminal law was introduced. On the sixteenth day of trial, an assistant clerk in the criminal division of the Superior Court, Middlesex County, called by the defendant, testified that before November 13, 1974, he had seen the defendant in court once a week and that the defendant was a very competent attorney. On cross-examination, the clerk testified that the defendant was competent in criminal matters. Although the prosecutor was improperly aggressive in his leading questions concerning the defendant's experience in the criminal law, we see no basis for reversing the conviction on this ground. Any prejudice was insubstantial. See *Commonwealth* v. *Stewart*, 375 Mass. 380, 387 (1978).


## *The Prosecutor's Closing Argument*

The defendant objects to the refusal of the judge to declare a mistrial because, in arguing to the jury, the prosecutor twice referred to Dr. Mezer, one of the defense witnesses, as a "hired gun." The first time, the prosecutor defined the term by stating, "I submit to you that is just what he was, hired by the defense, paid by the defense." In the course of the prosecutor's argument, the defendant raised several objections at the side bar and moved for a mistrial. Among those objections was the prosecutor's reference to Dr. Mezer as a "hired gun." The motion for a mistrial was denied. The judge asked at that point for any suggestions for specific instructions to the jury. Defense counsel made no suggestion for a curative instruction on this subject. In his charge, the judge instructed the jury in the usual manner, that statements of counsel were not to be considered as evidence.

We regard the reference to a "hired gun" as inappropriate argument. See *Commonwealth* v. *Shelley*, 374 Mass. 466, 469-472 (1978), where a similar but considerably more inflammatory and unfair argument was held to call for a new trial. However, the prosecutor's definition of the term as he used it is a mitigating circumstance. The fact that Dr. Mezer was retained by the defense was an appropriate subject of argument to the jury. See *Commonwealth* v. *McColl*, 375 Mass. 316, 324 (1978). A curative instruction would have put the matter in proper perspective, but the defendant, who may not have wished to have the point emphasized, made no request for such an instruction. In these circumstances, there is no basis for concluding that the judge erroneously denied the motion for a mistrial.

We consider here another contention directed to the prosecutor's closing argument, although it is not the subject of any exception or assignment of error. In the course of that closing argument, the prosecutor speculated about what conversation may have taken place between prior defense counsel and one of the defendant's psychiatric witnesses. He implied that the witness's testimony was the product of the urgings of prior defense counsel. The prosecutor properly challenged the strength of the defendant's claim of lack of criminal responsibility, but his reference to an imaginary conversation between defense counsel and the witness was plainly wrong. See *Commonwealth* v. *McColl, supra* at 324-325. A prosecutor "may argue all reasonable inferences from the evidence in the record" (S.J.C. Rule 3:22A, PF 13[a], *post* 927 [1979] [effective March 1, 1979]), but "[i]t is unprofessional conduct for the prosecutor intentionally at trial to refer to or to argue on the basis of facts outside the record" (*id.* at 927, PF 14). It is long past time for prosecutors to prepare their closing arguments carefully in order to avoid the possibility of reversals of convictions because of prosecutorial error. See *Commonwealth* v. *Haas*, 373 Mass. 545, 556-558 (1977); *Commonwealth* v. *Earltop*, 372 Mass. 199, 204 (1977) (Hennessey, C.J., concurring).

However, we think that no risk of a substantial miscarriage of justice resulted from the prosecutorial error for reasons expressed in the *McColl* case. There we said, "We think, however, that, in the entire context of the prosecutor's lengthy argument and in all the circumstances of the case, the remarks should not be considered so prejudicial as to require reversal. The prosecutor's basic premise that the claim of insanity was contrived by the defendant was warranted by the evidence, as the prosecutor demonstrated in his lengthy argument. In the context of that lengthy argument, the improper remarks were not of great consequence." *Id.* at 325. See *Commonwealth* v. *Fitzgerald*, 376 Mass. 402, 416 (1978); *Commonwealth* v. *Earltop*, 372 Mass. 199, 203-204 (1977).

## *Issues Concerning the Lack of Criminal Responsibility*

The defendant argues that he was entitled to a directed verdict of not guilty by reason of insanity. Failing that, he contends that he is entitled to a new trial, either as a matter of right or pursuant to G. L. c. 278, § 33E, because the judge charged the jury on the so called presumption of sanity, because the judge did not require the Commonwealth to call a court-appointed psychiatrist (who was instead called by the defendant), and because the weight of the evidence was such that a verdict of not guilty by reason of insanity was required.

The defendant urges us, in three instances, to reexamine and then abandon a rule of law which has been applicable in this Commonwealth in cases involving the question of criminal responsibility. (1) The defendant argues that a defendant should be entitled to a directed verdict of not guilty by reason of insanity where there is no evidence to support a finding of criminal responsibility. The issue is not present in this case because, as will be seen, there was evidence from which the jury could have concluded beyond a reasonable doubt that the defendant was criminally responsible for his conduct. In such a case,

clearly a directed verdict of not guilty by reason of "insanity" should not be granted. See *Commonwealth* v. *Kostka*, 370 Mass. 516, 538 (1976); *Commonwealth* v. *Smith*, 357 Mass. 168, 176 (1970). (2) The defendant's challenge to the judge's instructions concerning the "presumption of sanity" could be rejected because he made no objection, took no exception, and assigned no error on the subject. In this case, without using the word presumption, the judge instructed the jury that it could consider the fact that a great majority of men are sane and the probability that any particular man is sane. That consideration was not the only basis on which the jury could have founded its conclusion. The judge's instruction was proper. See *Commonwealth* v. *Kostka, supra* at 525-537, esp. 525 n.5, where we recently analyzed the propriety of such an instruction, suggested that the word presumption not be used in jury instructions, and concluded that such an instruction would be appropriate "even in a case where there is uncontradicted expert testimony that the defendant was insane at the time he committed the crime in question." *Id.* at 526. (3) The judge was correct in declining to order the Commonwealth to call as its own witness Dr. Weiss, a court-appointed psychiatrist who had examined the defendant pursuant to court order. Dr. Weiss was one of the three psychiatrists who testified for the defendant, and in the course of that testimony the defendant was permitted to stress the circumstances of Dr. Weiss's appointment. We held in *Commonwealth* v. *Cox*, 327 Mass. 609, 613-614 (1951), that the Commonwealth was not obliged to call such a witness, and we adhere to that view.

We come then to the defendant's argument that the weight of the evidence and the requirements of justice should prompt this court to grant the defendant a new trial under G. L. c. 278, § 33E. We recognize that there may be situations where the evidence of "insanity" is so compelling that a new trial should be granted. We granted new trials in *Commonwealth* v. *Mutina*, 366 Mass. 810,

811-812 (1975), and in *Commonwealth* v. *Cox,* 327 Mass.
609, 615 (1951), cases in which the expert testimony was
unanimous, the circumstances of the crimes tended to
support the experts' conclusions, and the verdicts were
supported almost exclusively by the presumption of sani-
ty. In other cases, where the Commonwealth introduced
no expert testimony in rebuttal, but either the circum-
stances of the crime or lay testimony tended to show
criminal responsibility, a majority of the court has denied
a new trial, even where the defendant had a documented
history of mental illness. See *Commonwealth* v. *Walker,*
370 Mass. 548, 582-583, cert. denied, 429 U.S. 943 (1976);
*Commonwealth* v. *Kostka,* 370 Mass. 516, 538-539 (1976).

We conclude that no new trial should be ordered. The
jury fairly could determine for themselves on the evi-
dence that the defendant was criminally responsible at
the time of the killing.[2] As will be seen, there was evi-
dence tending to show that the defendant was criminally
responsible, and the opinions of the defendant's expert
witnesses were not compelling.

The Commonwealth introduced evidence from a varie-
ty of witnesses to demonstrate that the defendant ap-
peared normal and acted rationally about the time of the
shooting. There was testimony from one or more police
officers who saw the defendant shortly after the shooting

---

[2] We note that the dissenting Justices in the *Kostka* case, who would
have granted a new trial, relied in part on an inference that the
Commonwealth either "was unsuccessful in a search for a medical
expert who would support the Commonwealth's position, or else the
Commonwealth made no attempt to obtain such expert assistance."
*Commonwealth* v. *Kostka,* 370 Mass. 516, 540 (1976) (Hennessey, C.J.,
dissenting in part). In this case, the Commonwealth had an expert
witness who would have testified on its behalf but for the fact that his
interview with the defendant was conducted in circumstances which
required the exclusion of his testimony.

The dissenting Justice in the *Kostka* case also relied on the exten-
sive evidence of the defendant's long-standing mental illness, which
preceded the alleged crime, an element not present in this case. *Id.* at
539. See also *Commonwealth* v. *Walker,* 370 Mass. 548, 584 (Hennes-
sey, C.J., dissenting in part), cert. denied, 429 U.S. 943 (1976).

that the defendant appeared calm; his face and color appeared normal; he was not shaking or sweating; he walked normally; he looked no different from his appearance in the court room; his voice was ordinary and appeared normal; he appeared sober and did not smell of alcohol; and he showed some expression on his face when questioned. In response to questions from the police, or spontaneously, he said that he was a former police officer and understood his rights; he asked to have handcuffs removed because he was embarrassed by people looking at him through a window and indicated he would not cause trouble; he showed his permit to carry a gun; he gave immediate answers to questions, hesitating (as well he might) only in response to a question concerning his marital status. As indicated earlier in this opinion, he asked Mr. Champa to represent him minutes after the shooting, and expressed his understanding to a police officer that he knew he was under arrest.

Mr. Champa also described the events just prior to the shooting. There was an argument. The defendant became excited and his face redder as the argument continued. He said to his wife, "You're not leaving here alive." Then, he reached in a coat pocket and took out a pistol. He took a clip from another pocket and inserted it in the gun. He pointed the gun at his wife and said, "You're dead, Lorraine." She said, "Oh, Bobby," and made a motion with her right hand, which was empty. The defendant then fired and kept pulling the trigger even after the gun was empty, saying, "You're dead, Lorraine."

There was evidence on behalf of the defendant which tended to show a change of personality in the weeks prior to the shooting. He was said to have been concerned about real and imaginary infidelities of his wife. His behavior was said to have become erratic in certain respects. Although there was medical testimony that the defendant had a problem with his throat caused by emotional stress, there was no evidence of a history of mental illness.

The opinions of the defendant's psychiatric experts were not consistent and in certain respects they undercut each other. The first of the defendant's experts, Dr. Mezer, testified that the defendant had been suffering from "paranoid schizophrenia, persecution complex" for about ten years. He said that this illness substantially interfered "with [the defendant's] ability to conform his conduct to the requirements of law," and that the defendant was not responsible for his behavior. Dr. Mezer was cross-examined at length. There was evidence that he may not have seen the defendant more than three times. He agreed that a paranoid schizophrenic can be at large in society with no danger to himself or others. He stated that, as far as he knew, the defendant suffered from no organic brain disease.

The second of the defendant's psychiatric witnesses, Dr. Morse, first saw the defendant in September, 1975, and treated him for fourteen months. He concluded that the defendant was suffering from extreme paranoia, a personality disorder, a form of disease. He concluded that the defendant was unable, on November 13, 1974, to conform his conduct to the requirements of law. He was not asked, in the manner indicated in *Commonwealth* v. *McHoul*, 352 Mass. 544, 547 (1967), whether the defendant's inability was the result of his extreme paranoia. On cross-examination, Dr. Morse agreed that earlier he had diagnosed the defendant as having "an organic brain syndrome"; that in the course of fourteen months' treatment he was unable to form an opinion whether the defendant was a schizophrenic; and that paranoia (his diagnosis) is not schizophrenia (Dr. Mezer's diagnosis). On redirect examination, Dr. Morse testified that paranoid schizophrenia is "very separate from a paranoid personality." Also on redirect examination, Dr. Morse, who saw the defendant far more often than did Dr. Mezer, testified that to determine whether the defendant was a schizophrenic, "I would have to see in great detail his thought processes," and that the defendant told him very little of

his innermost thoughts. It can be seen that Dr. Morse's testimony cast considerable doubt on that of Dr. Mezer and that, in any event, their diagnoses of the defendant's mental condition were different.

The defendant's third expert witness was Dr. Weiss, the psychiatrist who was appointed by the court to examine the defendant. He saw the defendant three times, in December, 1974, and in January, 1975. He concluded that, on November 13, 1974, the defendant was suffering from a "depressive state—severe," and, as a result, lacked substantial capacity to appreciate the wrongfulness of his conduct, and could not conform his conduct to the requirements of the law. On cross-examination, Dr. Weiss testified that he did not believe that the defendant was schizophrenic (Dr. Mezer's diagnosis) or suffering from organic brain syndrome (one of Dr. Morse's diagnoses); that he did not know whether the defendant had delusions on November 13, 1974; that he had not used the word "depression" in his report to the court; and that the first time he used the word was in his testimony in court.

The case involves a defendant who had no prior history of mental illness. The jury could have rejected each of the opinions of the psychiatric witnesses. Each opinion was based in part on facts which the defendant furnished to the expert and which were not corroborated by the expert or otherwise supported in the evidence. Each expert diagnosed a different mental illness, and in the course of some of the psychiatric testimony doubt was cast on the opinions of the other experts. This case presents substantially different circumstances from those cases involving an "insanity defense" where this court, or certain Justices of this court, have felt that justice required a new trial at which the Commonwealth would be expected to introduce expert psychiatric evidence.

*Judgment affirmed.*