COMMONWEALTH vs. ROBERT M. LUNDE.

Middlesex. April 5, 1983. — August 26, 1983.

Present: HENNESSEY, C.J., WILKINS, ABRAMS, NOLAN, & O'CONNOR, JJ.

*Homicide. Insanity. Evidence, Insanity. Practice, Criminal, Required finding, Capital case.*

At a murder trial, the Commonwealth's proof on the issue of the defendant's responsibility, including lay testimony as to the defendant's conduct before, during, and after the crime, warranted the judge's denial of the defendant's motion for a required finding of not guilty by reason of insanity, even though the defendant introduced both evidence of a long history of mental illness and testimony by three psychiatrists that he was insane at the time of the crime. [46-49]

A judge did not err in denying a defendant's motion for a new trial on the ground the verdict was against the weight of the evidence, where testimony of lay witnesses who saw the defendant before, during, and after the crime was sufficient to rebut expert testimony that the defendant was not criminally responsible for his conduct. [49]

INDICTMENT found and returned in the Superior Court Department on February 9, 1979.

The case was tried before *Hallisey, J.*

After review was sought in the Appeals Court, the Supreme Judicial Court ordered direct appellate review on its own initiative.

*Alfred E. Nugent (Robert P. Dolbec, Jr.,* with him) for the defendant.

*Pamela L. Hunt,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. The defendant, Robert M. Lunde, was convicted of murder in the second degree for the September 23, 1978, slaying of his brother-in-law, Philip C. Jones. At trial, the defendant's commission of the homicide was not contested. The sole issue was the defendant's criminal re-

sponsibility. The jurors rejected the defendant's claim that he was not criminally responsible and returned a verdict of guilty of murder in the second degree.[1]

The defendant appeals, claiming that it was error to deny his motion for a required finding of not guilty and for a new trial. He also asks us to exercise our power under G. L. c. 278, § 33E, either to enter a verdict of not guilty by reason of insanity or to order a new trial. We affirm and conclude that there is no reason to exercise our power under G. L. c. 278, § 33E.

We summarize the evidence. On September 23, 1978, the day of the killing, the defendant was living with his sister, her husband (the victim), and their four children, Robert (age fourteen), Lonnie (age twelve), Joseph (age eleven), and Wayne (age eight). At approximately 6 P.M., the defendant's sister saw him bringing trash out of the house. She told him to put it back because the trash would not be collected for several days. The family then had dinner. After dinner, his sister left the house with her son Lonnie. One child, Robert, went to the kitchen to feed the dog, and the victim and his two younger sons went into the living room to watch television.

The two younger children saw the defendant bring two or three bags of garbage to the sidewalk. They reported that fact to their father. The victim went to the front door and told the defendant to bring the trash back. The defendant said, "All right," and brought the trash at least halfway up the porch stairs.

The defendant then went to his bedroom, and the victim returned to the living room. The defendant entered the

---

[1] The indictment comprehended murder in the first degree. The case was submitted to the jurors for determination of murder in the first degree only on the theory of deliberately premeditated malice aforethought, murder in the second degree, not guilty by reason of insanity and not guilty. After the jury returned their verdict, the defendant was sentenced to the Massachusetts Correctional Institution, Walpole, for life. The judge wrote to the superintendent of Walpole suggesting that the defendant be transferred to Bridgewater State Hospital. The defendant was transferred to Bridgewater, and at the time of oral argument he was still at Bridgewater. See G. L. c. 123, § 18, and G. L. c. 127, § 97.

bathroom for two or three minutes and then walked to the doorway of the living room, pointed a gun at the victim, and began shooting.

After five or six shots the defendant started to reload the gun. The youngest child, Wayne, approached the defendant, who pointed the gun at the child and said, "You better get out of here before I kill you." The child ran out and, as he did, he heard more shots.[2] The defendant then left the living room and went to the front porch.

The police arrived, and the defendant told them that the victim had called him a "child molester." The officer asked, "Who?" and the defendant responded, "In there," and pointed inside the front door. The officer then entered the living room and found the victim's body on the floor with "holes" in the stomach and chest area.

The defendant was arrested and handcuffed. The officer read the defendant the warnings required by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), from a card, and then gave the defendant the card to read. The defendant looked at the card, handed it back to the officer and stated, "I want to talk to a lawyer." The officer ceased all questioning of the defendant.

The defendant was taken to the police station, where he was brought to the booking area and informed by the booking officer that he was being charged with assault with intent to murder.[3] The officer read the Miranda warnings to the defendant. The defendant replied that he wanted to talk to an attorney.

Then, the officer asked the standard booking questions. The defendant answered them clearly and coherently. When the booking procedure was completed, the officer gave the defendant the telephone book so that he could call a lawyer. The defendant appeared to have difficulty finding a number, and the officer asked the defendant if he

---

[2] By the time Wayne left the house, Robert and Joseph had left the house, and Robert had called the police.

[3] The officer did not know the victim had died.

wanted a particular attorney. The defendant named a lawyer,[4] and the officer located the attorney's name in the telephone book and wrote the telephone number on a piece of paper. He gave the paper to the defendant. The defendant then dialed the number himself. After waiting at least a minute for the defendant to speak, the officer, with the defendant's permission, listened to the telephone ringing. No one answered.

During the booking procedure, the patrolman who drove the defendant and the arresting officer to the police station entered the booking area and told the booking officer, "This all started over putting out the trash." The defendant then said that the victim called him an obscene name and a "child molester." The defendant stated that when he heard that he saw a lot of "colored lights."

The officer then directed two other police officers, one of whom was the arresting officer, to take the defendant to the detective's room, where they remained for three hours. The defendant did not speak to the officers during this time. The arresting officer said that on the night of the crime the defendant did not appear nervous, and he did not appear to have had anything alcoholic to drink. The officer said that the defendant looked the same in the courtroom as he had on the night of the crime.

The police searched the house for the murder weapon for approximately forty-five minutes before an officer found a zippered pouch containing a small handgun and other related items in a covered wicker basket near the front door.[5] The police also recovered twenty discharged cartridge casings from the living room, and eighteen spent bullets were removed from the victim's body during the autopsy. A ballistician concluded that the discharged casings found in

---

[4] The officer knew the attorney the defendant named, and stated that he was a busy and well-known lawyer.

[5] Inside the pouch were a semi-automatic pistol, a magazine to hold bullets and 108 bullets, eleven discharged cartridge casings and ten spent bullets.

the bag and in the living room, as well as the spent bullets removed from the victim's body,[6] all were fired from the same weapon.  He also stated that the gun must be reloaded after seven shots.

The heart of the defense was the presentation of three psychiatric experts who all testified that the defendant was not criminally responsible for his conduct on September 23, 1978, and that he suffered from schizophrenia, paranoid type, a serious mental illness.  The defense presented the defendant's extensive history of mental illness, including some thirty prior psychiatric hospitalizations, spanning over twenty years.  Based on the defendant's history of mental illness and the defendant's description of his mental state at the time of the murder, each doctor concluded that the defendant was not criminally responsible for his acts on September 23, 1978.  Each doctor was of the opinion that Lunde lacked both substantial capacity to appreciate the wrongfulness of his conduct, and substantial capacity to conform his conduct to the requirements of the law.

1. *Motion for a required finding of not guilty.*  At the close of the Commonwealth's case, the defendant filed a motion for a required finding of not guilty of murder and all lesser included offenses.  This motion was denied, and the defendant objected to its denial.  On appeal, the defendant does not argue that the Commonwealth had not presented sufficient evidence by the close of its case-in-chief to warrant submitting the case to the jury for determination.  See *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979); *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 & n.1 (1976).  Rather, he claims that the Commonwealth's proof on the issue of criminal responsibility deteriorated between the time the Commonwealth rested and the close of all the evidence, see *Commonwealth* v. *Amazeen,* 375 Mass. 73, 80 n.5 (1978); *Commonwealth* v. *Kelley, supra,* and therefore the judge erred in denying his motion for a required finding

---

[6] The victim had been shot twenty-six times.

of not guilty by reason of insanity at the close of the evidence.[7]

The defendant claims that the unanimity of the three psychiatric opinions, coupled with the defendant's twenty-year history of mental illness, required the judge to order entry of a required finding of not guilty by reason of insanity at the close of all the evidence.[8] The short answer to the defendant's argument is that the law "does not give the opinions of experts . . . the benefit of conclusiveness, even if there are no contrary opinions introduced at the trial." *Commonwealth* v. *Smith*, 357 Mass. 168, 178 (1970). "The jury need not accept uncontradicted expert testimony that the defendant was insane at the time of the murder." *Commonwealth* v. *Shelley*, 381 Mass. 340, 347 (1980). *Commonwealth* v. *Gould*, 380 Mass. 672, 679 (1980). *Commonwealth* v. *O'Brien*, 377 Mass. 772, 779-780 (1979). *Commonwealth* v. *Costa*, 360 Mass. 177, 183 (1971). *Commonwealth* v. *Ricard*, 355 Mass. 509, 513-515 (1969). See *People* v. *Spears*, 63 Ill. App. 3d 510, 518 (1978); *People* v. *Stoddard*, 48 Mich. App. 440, 447-448 (1973); *State* v. *Hoskins*, 292 Minn. 111, 137-138 (1972); *State* v. *Rullo*, 120 N.H. 149, 152 (1980). Undoubtedly, the opinion of the experts permitted a conclusion that the defendant was not criminally responsible, but such a conclusion was not required.

The Commonwealth concedes that the defendant is mentally ill, but argues that the evidence is sufficient to support the jury's verdict. We agree. There was evidence that at

---

[7] The defendant's motions for a required finding were not denominated motions for a required finding of not guilty by reason of insanity. There is no question, however, that the trial was conducted and the motions argued on that ground. We consider the issue on that basis. See *Commonwealth* v. *Amaral*, 389 Mass. 184, 190 n.7 (1983); *Commonwealth* v. *Shelley*, 381 Mass. 340, 346 (1980).

[8] Defense counsel said that he would renew his motion after the defense rested, but failed to do so. However, he renewed his motion after the judge instructed the jury, and before they returned with a verdict. The judge heard the motion as if it were made as of the time the defense rested and denied it. The defendant seasonably objected to its denial. We consider the motion to be timely and properly before us.

the time of the crime the defendant was oriented as to time, place, and persons. See *Commonwealth* v. *Cole*, 380 Mass. 30, 35-36 (1980). The defendant had the capacity to refrain from shooting his nephew. The defendant had the murder weapon in the house and he hid it and the ammunition after the crime. Further, when the defendant spoke with police,[9] he was coherent and calm. At the station, the defendant responded cogently to the booking officer's questions, understood the Miranda warnings, remained silent, and requested a specific attorney. At the station, the defendant did not appear nervous or as if he had been drinking. The witnesses said that the defendant was not agitated or angry[10] on the night of the murder.

Thus, contrary to the defendant's assertion, the Commonwealth's case did not rest solely on the probability that "a great majority of men are sane," *Commonwealth* v. *Clark*, 292 Mass. 409, 415 (1935). Rather, the Commonwealth's case included evidence of the defendant's conduct before, during, and after the crime, which the "jury are permitted to weigh in reaching their conclusions on the insanity issue," *Commonwealth* v. *Walker*, 370 Mass. 548, 581, cert. denied, 429 U.S. 943 (1976), and from which they had the right to infer the defendant's mental competency, *Commonwealth* v. *Amaral*, 389 Mass. 184, 192 (1983). See

---

[9] The judge, sua sponte, held a voir dire to determine the voluntariness of the defendant's statements to police. Both the district attorney and defense counsel wanted the defendant's statements admitted on the issue of the defendant's criminal responsibility. The judge instructed the jury to consider whether the defendant's statements were the voluntary product of a rational intellect. He instructed the jurors that the defendant's statements were to be considered solely as evidence bearing on the defendant's criminal responsibility. "The sole value of [the defendant's] responses was the inference that could be drawn from them on the issue of criminal responsibility." *Commonwealth* v. *Cole*, 380 Mass. 30, 40-42 & n.14 (1980), and cases cited. The defendant does not claim any error in the limited admission of his request for counsel on the issue of criminal responsibility. See *Commonwealth* v. *Burke*, 339 Mass. 521, 532-533 (1959); *Commonwealth* v. *Sazama*, 339 Mass. 154, 157-158 (1959).

[10] There was some evidence that the victim and the defendant had an argument over the trash.

*Commonwealth* v. *Smith,* 357 Mass. 168, 180-181 (1970);
*Commonwealth* v. *Ricard,* 355 Mass. 509, 514-515 (1969);
*Commonwealth* v. *Francis,* 355 Mass. 108, 111 (1969);
*Commonwealth* v. *Hartford,* 346 Mass. 482, 489-490
(1963).[11] The lay testimony, and the defendant's actions,
warranted submitting the issue of the defendant's criminal
responsibility to the jury "although the defendant had a
history of mental illness and no expert testified for the Com-
monwealth." *Commonwealth* v. *Brown,* 387 Mass. 220,
222 (1982). See *Commonwealth* v. *O'Brien,* 377 Mass. 772,
781 (1979). See also *State* v. *Cano,* 103 Ariz. 37, 41 (1968);
*Coonan* v. *State,* 269 Ind. 578, 585 (1978); *State* v. *Sagebiel,*
206 Kan. 482, 489 (1971); *State* v. *Leonard,* 300 N.C. 223,
231 (1980). We conclude that there was no error in the
denial of the motion for a required finding of not guilty by
reason of insanity.

2. *Motion for a new trial.* The defendant asserts that he
is entitled to a new trial as a matter of right because the ver-
dict is against the weight of the evidence. This claim is
based on the unanimity of the psychiatric testimony, and his
assertion that the Commonwealth's case rested solely on the
probability that the defendant was sane at the time of the
killing, because of the fact that "a great majority of men are
sane." *Commonwealth* v. *Clark,* 292 Mass. 409, 415
(1935). We have rejected that claim. "The testimony of
the witnesses who saw [Lunde before the offenses and] at
the time of the offenses and immediately thereafter ade-
quately rebutted the testimony of the experts on the issue of
sanity." *Commonwealth* v. *Cole,* 380 Mass. 30, 37-38
(1980). There is no error in the denial of the motion for a
new trial.

---

[11] In their rejection of the defendant's claim that he was not responsible,
the jury also could have considered the fact that the expert opinions were
weakened by cross-examination and by parts of the hospital records.

3. *Relief pursuant to G. L. c. 278, § 33E.*[12]  The defendant contends that we should exercise our supervisory power, and either grant him a new trial, or enter a verdict of not guilty by reason of insanity.  Although we perceive no error of law in the trial, our duty pursuant to G. L. c. 278, § 33E, is to consider broadly the entire case to determine if the verdict is "consonant with justice," *Commonwealth* v. *Davis*, 380 Mass. 1, 15 n.20 (1980), quoting *Commonwealth* v. *Seit*, 373 Mass. 83, 94 (1977), or if it is "against the law or the weight of the evidence," G. L. c. 278, § 33E.  The duty imposed on us by the statute does not "convert this court into a second jury, which must be convinced beyond a reasonable doubt of the guilt of a defendant by reading the reported evidence, without the advantage of seeing and hearing the witnesses."  *Commonwealth* v. *Smith*, 357 Mass. 168, 181 (1970), quoting *Commonwealth* v. *Gricus*, 317 Mass. 403, 406-407 (1944). The issue of criminal responsibility is for the jury, not this court. See *Commonwealth* v. *Prendergast*, 385 Mass. 625, 638 (1982).  Since the issue of the defendant's criminal responsibility was fully and fairly before the jury, we conclude that justice does not require that their verdict be disturbed.[13]  *Commonwealth* v. *Marshall*, 373 Mass. 65, 72 (1977).

*Judgment affirmed.*

---

[12] Since the offense was committed before July 1, 1979, we consider the case under G. L. c. 278, § 33E, as in effect prior to its amendment by St. 1979, c. 346, § 2.  *Commonwealth* v. *Davis*, 380 Mass. 1, 16 (1980).

[13] The defendant was tried approximately two months after our decision in *Commonwealth* v. *Gould*, 380 Mass. 672 (1980).  The jurors were instructed in accordance with that decision.