## COMMONWEALTH VS. ZANE A. RASMUSEN.

Barnstable. March 11, 2005. - July 13, 2005.

Present: MARSHALL, C.J., IRELAND, SPINA, SOSMAN, & CORDY, JJ.

*Homicide. Home Invasion. Burglary. Assault and Battery by Means of a Dangerous Weapon. Felony-Murder Rule. Insanity. Evidence,* Insanity. *Practice, Criminal,* Capital case, Instructions to jury, Presumptions and burden of proof, Duplicative convictions.

At a murder trial, the evidence was sufficient to prove the defendant's sanity beyond a reasonable doubt, despite the Commonwealth's not calling an expert witness to refute the defendant's expert's testimony to the contrary, where the Commonwealth made a vigorous challenge to the defense expert's conclusions and credibility on cross-examination, and where the evidence of the defendant's sanity at the time of the attacks was compelling [661-664]; moreover, the fact that the Commonwealth did not request an instruction on the "presumption of sanity" did not undermine the soundness of the jury's finding that the defendant was sane at the time of the attacks, where the instruction is for the benefit of the Commonwealth, and where the Commonwealth's decision not to rely on the "presumption" suggested the strength of the Commonwealth's proof of criminal responsibility [664-665]; finally, the defendant's convictions were not illogical or against the weight of the evidence [665-666].

At the trial of indictments charging murder, home invasion, armed burglary, and assault and battery by means of a dangerous weapon, the defendant's conviction of armed burglary was duplicative of his conviction of felony-murder, and therefore, this court vacated the conviction and sentence for armed burglary. [666-667]

INDICTMENTS found and returned in the Superior Court Department on March 12, 2002.

The cases were tried before *Regina L. Quinlan,* J.

*Greg T. Schubert* for the defendant.

*Julia K. Holler,* Assistant District Attorney, for the Commonwealth.

CORDY, J. In the early morning of January 26, 2002, six young men, including the defendant, Zane A. Rasmusen, broke into an apartment in Yarmouth, seeking revenge against another group

of young men with whom they had fought at a party earlier in the evening. Rasmusen was armed with a large kitchen knife. Shawn Kimball, a guest in the apartment, was beaten and stabbed several times. Spencer MacLeod, who had not been involved with the earlier fight and was sleeping upstairs when Rasmusen's group forced its way in, joined the fracas and attempted to pull several attackers away from Kimball. He was stabbed in the heart and died. Rasmusen was arrested the next day and later indicted. His principal defense at trial was insanity. A jury convicted him of felony-murder in the first degree for the killing of MacLeod, home invasion, armed burglary, and assault and battery by means of a dangerous weapon for the attack on Kimball. Rasmusen appealed, and we have carefully reviewed the entire record, as is our responsibility under G. L. c. 278, § 33E. Both Rasmusen and the Commonwealth agree that we should reverse Rasmusen's conviction for the felony that underlies the felony-murder conviction as duplicative, and we therefore reverse Rasmusen's conviction for armed burglary. In all other respects, we affirm the convictions.

1. *Background.* The evidence at trial included the following. The altercation that resulted in the death of MacLeod had its origins in the violent feuding of two groups of young men, all of whom lived in the vicinity of Yarmouth and knew each other. On the evening of January 25, 2002, Rasmusen and several friends attended a party at a large summer home near the beach in West Dennis.[1] Earlier, before Rasmusen's arrival, another group, including Germaine Conceptione, had been denied admission to the party. Insults had flown back and forth and a fight had broken out between this group and Rasmusen's friends.[2] The fight was apparently short lived, and Conceptione's group left to assess their injuries and plot strategy at the

---

[1] The defendant, Zane A. Rasmusen, and his friends had been drinking beer that evening. Rasmusen himself admitted to consuming one six-pack of beer and one shot of hard liquor. Others attending the West Dennis party were also drinking beer.

[2] Germaine Conceptione testified at trial that one of Rasmusen's friends told his group that they were "not welcome" at the West Dennis party and said, "This is a million dollar house, and you people need to go back to the village where you came from." The comment apparently referred to Swan Pond Village, also known as Alewife Circle, the housing development where Conceptione's group could often be found.

apartment of a friend on Alewife Circle in Yarmouth, where Shawn Kimball joined them.

The group, now including Kimball, decided to return to the party in West Dennis and get revenge. They arrived back at the home after midnight, unarmed, and entered through the open garage door. A fight ensued, this time including Rasmusen. During the fight, Conceptione put Rasmusen in a headlock, nearly asphyxiating him. Conceptione eventually released Rasmusen and, with the rest of his group, ran to their vehicles and returned to the Alewife Circle apartment. Rasmusen, wielding a knife he had grabbed from a drawer in the home's kitchen, attempted to pursue Conceptione, slashing the tires of one of the fleeing vehicles. Shortly thereafter, he collapsed on the lawn and vomited violently, apparently from the effects of the headlock.

After recovering, Rasmusen telephoned his girl friend, who picked him up from the party in her Chevrolet Suburban sport utility vehicle. When he got into the Suburban, Rasmusen was carrying a long-bladed kitchen knife. They drove to another home, where Rasmusen's friends reconvened and plotted their own revenge, particularly against Conceptione. A witness to this meeting testified that when one of the participants said, "Let's go fuck them up," Rasmusen responded, "I'm not fucking anyone up. I'm going to kill someone."

Rasmusen's group proceeded to gather garden tools (to be used as weapons) and loaded them into the Suburban. They then drove to the homes of other friends, picking up two pit bull dogs at one, and a baseball bat, a golf club, and a crowbar at another. Fully armed, they headed to the Alewife Circle area to look for Conceptione and his friends. As they drove through the neighborhood, someone spotted Kimball through the window of one of the apartments. Rasmusen and five companions got out of the Suburban, armed themselves with the weapons they had brought, and headed for the apartment.

Kimball saw the group approaching and tried to lock the door. Someone threw a brick through the kitchen window, and four of the group, including Rasmusen, stormed the apartment, breaking through the locked door with such force that they

destroyed the door frame.[3] The four men immediately attacked Kimball with their weapons; one member of the group struck him with a golf club, another struck him with a wooden stick, and another with a crowbar. Wielding the knife, Rasmusen stabbed Kimball four times. During these attacks, Kimball eventually fell to the floor.

Conceptione was not in the apartment during the assault, having left before Rasmusen's group arrived. Upstairs, however, two women were feeding the baby of the apartment owner, who was not at home. MacLeod, the boy friend of one of the women, was asleep in another room. Awakened by the fighting, Mac-Leod came down the stairs and attempted to pull the four men off of Kimball. Those men turned their attention from Kimball to MacLeod. Kimball saw Rasmusen stab MacLeod twice in the chest. Rasmusen and his companions then fled the scene in the waiting Suburban. When his girl friend asked what had happened, Rasmusen responded, "I stabbed someone." He also expressed regret that Conceptione had not been at the apartment and said that he "fucked [Kimball] up" and then "fucked [Mac-Leod] up." Sitting in the front passenger seat, Rasmusen cleaned the blood-soiled knife with a T-shirt and directed his girl friend to drive to a nearby pond where he threw the knife into the water.

Meanwhile, those who remained at the Alewife Circle apartment telephoned 911. Shortly after 3 A.M., paramedics arrived and attended to the badly wounded Kimball and MacLeod. MacLeod had a heart rhythm but no pulse or blood pressure. After MacLeod was transported to a local hospital, the emergency room physician discovered that the stab wound had fatally punctured MacLeod's heart; the physician pronounced him dead. When the police arrived at the apartment, Kimball was screaming, naming the men involved in the attack, including Rasmusen. Kimball was transported to the hospital in a second ambulance. He recovered from his injuries.

The next day, Rasmusen was arrested and brought to the police station. After he was booked, advised of his Miranda rights, and detained in a holding cell, Rasmusen asked to speak

---

[3]Two members of the group remained outside, struggling with the two pit bulls and eventually getting back inside the Suburban.

with a detective investigating the stabbings, Charles Peterson of the Yarmouth police department. During the interview, which lasted nearly two hours, Rasmusen described the previous night's events. He said that his group had gone to the Alewife Circle apartment "to get" Conceptione, and that he had brought a knife with him for that purpose. He admitted stabbing Kimball, but denied knowingly stabbing MacLeod, offering that it was possible he had stabbed MacLeod when MacLeod had tried to break up the fight.[4]

Rasmusen's trial was severed from that of the others charged in the Alewife Circle attack. In his defense, Rasmusen offered the testimony of his mother and a forensic psychiatrist about his long history of psychiatric problems to demonstrate that he lacked criminal responsibility for his conduct on the evening of the attack. Rasmusen's mother described his troubled childhood, which involved witnessing her being beaten by an alcoholic husband from the time he was a toddler, and a violent home invasion and assault when he was twelve years old. After the home invasion, Rasmusen began drinking and using drugs, and he was often violent when intoxicated. His mother testified that when she saw him on the morning after the stabbings, he appeared to be drunk or high. The psychiatrist, who examined Rasmusen, his medical records, and court records, testified that Rasmusen suffered from four (previously undiagnosed) psychological disorders — posttraumatic stress disorder, intermittent explosive disorder, substance induced mood disorder, and a nonspecific learning disorder. The psychiatrist opined that as a result of these disorders, at the time of the stabbings at the Alewife Circle apartment, Rasmusen was experiencing an uncontrolled pathological rage precipitated by Conceptione choking him at the West Dennis party. Therefore, the psychiatrist testified, Rasmusen was unable to appreciate the criminality of his actions and lacked the capacity to conform his behavior to the requirements of law.

2. *Criminal responsibility.* At trial, Rasmusen did not dispute that he was involved in the attack at the Alewife Circle apartment. As exemplified in defense counsel's closing, Ras-

---

[4]Rasmusen was interviewed a second time the following day, but statements made during that interview were suppressed prior to trial.

musen argued that (1) there was reasonable doubt whether Rasmusen was the one that stabbed MacLeod during the altercation[5]; (2) if the Commonwealth had demonstrated that he stabbed MacLeod, he should be found not guilty of murder by reason of insanity; and (3) if the Commonwealth had demonstrated that he was not insane, he should be found guilty of a lesser degree of homicide than murder in the first degree as a result of his impaired mental condition. On appeal, Rasmusen claims that the Commonwealth failed to prove Rasmusen's sanity beyond a reasonable doubt because it neither offered any expert evidence of sanity to rebut the defense expert's testimony nor requested an instruction on the "presumption of sanity."[6] We find no merit in Rasmusen's argument because the evidence warranted the jury's finding that he was criminally responsible.

"A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality [wrongfulness] of his conduct or to conform his conduct to the requirements of law." *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). "When a defendant claims that he is not criminally responsible for his acts, the Commonwealth bears the burden of proving beyond a reasonable doubt that the defendant is sane." *Commonwealth* v. *Kappler*, 416 Mass. 574, 578 (1993).

---

[5]One of the defense theories was that another of the attackers might have stabbed Spencer MacLeod, that Shawn Kimball could not really have seen what was happening because he was wounded and on the floor, and that one of the members of the Rasmusen group who testified for the Commonwealth was lying about incriminating statements Rasmusen made to the group right after the event. There was, however, no evidence that anyone other than Rasmusen was armed with a knife, and MacLeod's wounds were deep and consistent with the knife Rasmusen admittedly brought to the apartment and used to stab Kimball.

[6]Rasmusen frames his argument as if we were reviewing the denial of his request for a required finding of not guilty, despite acknowledging that such a finding is not appropriate where the defense is lack of criminal responsibility. See *Commonwealth* v. *Keita*, 429 Mass. 843, 845 (1999) ("[W]e have never taken away from a trier of fact the determination whether a defendant was criminally responsible when the evidence raised the issue"). We therefore review this argument as a part of our obligation under G. L. c. 278, § 33E, to determine whether the jury's verdict is "consonant with justice." *Commonwealth* v. *Lake*, 410 Mass. 47, 51 (1991), quoting *Commonwealth* v. *Mahnke*, 368 Mass. 662, 701 (1975), cert. denied, 425 U.S. 959 (1976). See *Commonwealth* v. *Fernandes*, 436 Mass. 671, 675-676 (2002).

We have repeatedly said that the Commonwealth may meet its burden to prove the defendant's sanity without calling an expert, notwithstanding testimony by defense experts to the contrary. *Commonwealth* v. *Shelley*, 381 Mass. 340, 347 (1980) ("The jury need not accept uncontradicted expert testimony that the defendant was insane at the time of the murder"). See, e.g., *Commonwealth* v. *McLaughlin*, 431 Mass. 506, 509 n.1 (2000); *Commonwealth* v. *Kappler, supra; Commonwealth* v. *Lunde*, 390 Mass. 42, 47 (1983). The jury may "infer sanity from the 'facts underlying the crime and evidence of [the defendant's] actions before and after the crime.'" *Commonwealth* v. *Kappler, supra* at 579, quoting *Commonwealth* v. *Cullen*, 395 Mass. 225, 229 (1985). Given the paramount role of the jury in assessing the defendant's criminal responsibility, it is unsurprising that "we are aware of no case in which we have ordered the entry of a judgment of not guilty by reason of the defendant's lack of criminal responsibility after a jury has rejected such a defense." *Commonwealth* v. *Fernandes*, 436 Mass. 671, 676 (2002).

In this case, the jury had before them expert testimony offered by the defendant that suggested that the defendant lacked criminal responsibility for his conduct. Relying on this testimony, defense counsel argued in closing that the jury should find Rasmusen not guilty by reason of insanity. The Commonwealth made a vigorous challenge to the expert's conclusions and credibility on cross-examination and, pointing to the facts of the underlying crime, argued strenuously in its closing that Rasmusen was criminally responsible. In their role as fact finder, the jury plainly rejected Rasmusen's insanity defense, and had an ample basis on which to do so.

The evidence of Rasmusen's sanity at the time of the attacks was compelling. Angered and humiliated by the earlier fight at the house in West Dennis, Rasmusen and his group of friends discussed, planned, and executed the raid on the Alewife Circle apartment. As described by Kimball, Rasmusen's conduct during the attacks was consistent with deliberate combat. After the raid was over, Rasmusen cleaned and disposed of the knife, and Rasmusen's subsequent interview with the police revealed that he had a clear memory of his involvement in and the purpose of

the attack.[7] The jury were warranted in inferring Rasmusen's sanity from this evidence and therefore could have rationally rejected the opinion of Rasmusen's one expert witness, who concluded that Rasmusen was insane at the time of the attacks by describing all of Rasmusen's conduct as consistent with four previously undiagnosed mental disorders. See *Commonwealth* v. *Kappler, supra* at 579 ("The question of what inferences to draw from this evidence is for the jurors, not the trial judge and not this court").

That the Commonwealth did not request and the judge did not provide a jury instruction on the "presumption of sanity" does not undermine the soundness of the jury's finding that Rasmusen was sane at the time of the attacks. The judge provided extensive instructions to the jury to guide their deliberations on whether the Commonwealth had met its burden to prove criminal responsibility and the absence of mental impairment. Although we said in *Commonwealth* v. *Keita*, 429 Mass. 843, 846 (1999), that a "jury instruction concerning the presumption of sanity should be given in every case in which the question of the defendant's criminal responsibility is raised," we have never held that the failure to give such an instruction should be grounds for a new trial or presents a substantial likelihood of a miscarriage of justice. Indeed, the instruction is for the benefit of the Commonwealth, not the defendant. It would be paradoxical for the absence of the instruction to constitute such a grave error when the "presumption" merely reflects our recognition that jurors should be permitted to infer or presume the defendant's sanity from their "common knowledge that a great majority of people are sane, and the probability that any particular person is sane." *Id.*, quoting *Commonwealth* v. *Brennan*, 399 Mass. 358, 364 (1987). That the Commonwealth secured the convictions without the benefit of a "presumption of sanity" instruction suggests the strength, not weakness, of the Commonwealth's proof of criminal responsibility. The Commonwealth chose not to rely on the "presumption," instead

---

[7]The circumstances of this case are thus unlike those cases where the defendant presented "very strong evidence of his lack of criminal responsibility," which may have been misunderstood by the jury. *Commonwealth* v. *Mutina*, 366 Mass. 810, 816 (1975) (verdict against weight of evidence and new trial ordered). See *Commonwealth* v. *Keita, supra* at 847-848, and cases cited.

presenting "evidence of the defendant's conduct before, during, and after the crime, which the 'jury are permitted to weigh in reaching their conclusions on the insanity issue,' and from which they had the right to infer the defendant's mental competency." *Commonwealth* v. *Lunde, supra* at 48, quoting *Commonwealth* v. *Walker,* 370 Mass. 548, 581, cert. denied, 429 U.S. 943 (1976).

In a related argument, Rasmusen claims that the convictions are illogical and should be reversed pursuant to G. L. c. 278, § 33E, as against the weight of the evidence. This argument is premised on the theory that the jury must have accepted Rasmusen's evidence of insanity because it found Rasmusen not guilty of murder in the first degree by reason of deliberate premeditation and by reason of extreme atrocity or cruelty, despite "fairly overwhelming" evidence suggesting Rasmusen's guilt on those theories. Consequently, Rasmusen contends the jury must have misunderstood how to apply their finding of insanity to the remainder of the charges. We do not agree. There are many possible explanations for the jury's verdicts and no reason to conclude that the instructions were either misunderstood or misapplied to the evidence.

First, MacLeod had had no involvement in the prior altercation, and the jury could well have found that he was not the target of Rasmusen's planned revenge, that his presence at the scene was an unforeseen circumstance, and that his death was unpremeditated and unintended.[8] The jury could also have found that MacLeod's injuries, insofar as they were suffered in the course of breaking up a violent and heated altercation, were not the product of extreme atrocity or cruelty. Such conclusions would not be inconsistent with the jury's finding that Rasmusen was criminally responsible for his conduct during the incident, including planning and executing the vicious assault on Kimball and the predicate felonies of armed burglary and home invasion.

Just as likely, the evidence of Rasmusen's impaired mental capacity may have created doubt in the minds of the jury on the

---

[8]There was evidence at trial that MacLeod and Rasmusen were acquaintances and that Rasmusen was a good friend of MacLeod's brother. The jury may have considered this evidence in assessing whether Rasmusen had the specific intent to kill MacLeod.

element of premeditation in the killing of MacLeod, and on whether the Commonwealth had sustained its burden of proving that Rasmusen had acted with extreme cruelty or atrocity.[9] It would have been perfectly consistent with that doubt for the jury to conclude that Rasmusen nevertheless had the mental capacity to intend an armed break-in for the purpose of gaining revenge.

In this case, the issues of criminal responsibility and diminished capacity were "fully and fairly before the jury," and "justice does not require that their verdict be disturbed." *Commonwealth* v. *Lunde*, 390 Mass. 42, 50 (1983).

3. *Felony underlying felony-murder conviction.* In addition to his conviction for felony-murder, Rasmusen was convicted of the two underlying felonies — home invasion and armed burglary. The Commonwealth argued and the jury were instructed by the judge that they could consider both felonies as the predicates for felony-murder. Rasmusen argues that the felony conviction underlying the murder conviction should be vacated as duplicative of his conviction of murder in the first degree. "When a murder conviction is based on a felony-murder theory, the underlying felony, whatever it may be, is always a lesser included offense and the conviction for that felony, in addition to the conviction of murder, is duplicative." *Commonwealth* v. *Gunter*, 427 Mass. 259, 276 (1998). See *Commonwealth* v. *Lucien*, 440 Mass. 658, 673 (2004), citing *Commonwealth* v. *Anderson*, 425 Mass. 685, 692 (1997). The Commonwealth concedes that one of the two predicate felonies should be vacated.

Either offense could serve as the underlying felony for the felony-murder conviction. The home invasion conviction depended on the Commonwealth's proof that Rasmusen knew Kimball was present in the apartment at the time Rasmusen and his friends forced their way inside, and so may properly be

---

[9]The jury may have telegraphed such a possibility in asking the following question during their deliberations: "If we were to find that there was 'diminished capacity,' then what role does that play in this decision?" In response, the judge correctly and meticulously reinstructed them on diminished capacity and how it might bear on their consideration of whether the Commonwealth met its burden of establishing the elements of knowledge and intent as to each of the charged offenses.

considered an independent crime in these circumstances.[10] The armed burglary conviction, lacking such a link to Kimball, has broader application to Rasmusen's conduct toward MacLeod and is therefore better suited to serve as the predicate felony for the felony-murder conviction. Consequently, we vacate Rasmusen's conviction and sentence for armed burglary as duplicative of his felony-murder conviction.

4. *Review under G. L. c. 278, § 33E.* We have reviewed the record as a whole. Rasmusen was represented by able counsel, and there was no error at trial that presents a substantial likelihood of a miscarriage of justice. Because we "decline to substitute our view for the decision reached by the jury" regarding Rasmusen's sanity, we see no reason to exercise our power under G. L. c. 278, § 33E, to reduce the verdict or order a new trial. *Commonwealth* v. *Fernandes*, 436 Mass. 671, 676 (2002). The convictions are affirmed, except for the conviction on indictment numbered 02-025-03, alleging armed burglary, which is hereby vacated. That indictment is remanded to the Superior Court for dismissal. See *Commonwealth* v. *Lucien, supra* at 674.

*So ordered.*

---

[10]The home invasion statute, G. L. c. 265, § 18C, provides, in relevant part: "Whoever knowingly enters the dwelling place of another *knowing or having reason to know that one or more persons are present within or knowingly enters the dwelling place of another and remains in such dwelling place knowing or having reason to know that one or more persons are present within* while armed with a dangerous weapon, uses force or threatens the imminent use of force upon any person within such dwelling place whether or not injury occurs, or intentionally causes any injury to any person within such dwelling place shall be punished . . ." (emphasis added).